No. 32,826

LAWRENCE BRENNAN, a Minor, by MARGARET BRENNAN, his Mother, and Next Friend, *Appellant*, v. CLARENCE G. DENNIS, EARL ROBINSON and HOWARD PENNINGTON, Trustees; CLARENCE G. DENNIS and EARL ROBINSON, Executors, and EARL ROBINSON, WILLIAM ROBINSON and KERMIT CLARK, *Appellees.*

(57 P. 2d 431)

Opinion filed May 9, 1936.

*H. W. Stubbs,* of Ulysses, *Howard Rooney,* of Dodge City, *G. L. Light, Auburn G. Light,* both of Liberal, and *W. D. Jochems,* of Wichita, for the appellant.

*C. E. Vance, Clifford R. Hope, A. M. Fleming,* all of Garden City, *Clarence G. Dennis, H. D. Shrader,* both of Sublette, *Charles Tucker* and *Charles Vance,* both of Liberal, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This action was brought in the district court of Haskell county to set aside an order of the probate court of that county admitting to probate a copy of a will dated March 12, 1931, of Clara Johnson, deceased, on the grounds: (1) That the probate court of Haskell county had no jurisdiction to probate such will, for the reason that the testatrix was a resident of Ford county at the time of her death, April 12, 1933, and (2) that the will of March 12, 1931, had been specifically revoked by a subsequent will made by the testatrix August 18, 1932, which will had been duly admitted to probate in the probate court of Ford county, Kansas, and that the will of March 12, 1931, had been further revoked in that the testatrix had, with her own hands, destroyed and mutilated it for the purpose and with the intent of rendering it null and void and ineffective. The answer admitted formal matters, contained a general denial, and alleged: (1) That the testatrix was mentally incompetent to make a will on August 18, 1932, or to revoke her former will; (2) that the execution by the testatrix of a will on August 18, 1932, was the result of undue influence, fraud, conspiracy and misrepresentation of the plaintiff, members of his family and other named persons, and (3) that the probate judge of Ford county had no jurisdiction to probate the will of August 18, 1932, for the reason that the testatrix was a resident of Haskell county at the time of her death. All affirmative allegations of the answer were put in issue by an appropriate reply.

Defendants asked the court to call a jury in an advisory capacity, whereupon plaintiff asked a change of venue because of the prejudice of the inhabitants of Haskell county. Both motions were granted. The case was transferred to Seward county, where it was tried to the court with an advisory jury. Answering special questions the jury found Mrs. Johnson was a resident of Haskell county at the time of her death; that on August 18, 1932, she was competent to make the will she executed on that date; that she knew what property she owned, knew her relatives, neighbors and acquaintances and the nature of her acts, and that she knew and understood what disposition she made of her property by the will. The jury further found that the will of August 18, 1932, was procured through undue influence,

and detailed specific acts beginning August 12, 1932, and ending August 18, 1932, constituting the influence it found to be undue and which the jury found "under normal conditions would not be classed as undue influence." Plaintiff moved for judgment on the answers returned by the jury, correctly contending the acts detailed did not constitute undue influence as that term is used in the law. Defendants moved to set aside the answers by which the jury found the testatrix was competent to make the will. ·The trial court overruled each of these motions, and in lieu of the findings of the jury made findings of fact and conclusions of law. Plaintiff objected to some of the findings of fact made by the court and its conclusions of law and moved that they be modified in certain respects, or set aside, and for additional findings, and for judgment, and also moved for a new trial. All these motions were overruled, judgment was rendered for defendants, and plaintiff has appealed.

Appellees make the point that appellant is not entitled to be heard for the reason that the notice of appeal does not specifically state that the appeal is from the motion for a new trial. The journal entry shows that the findings of fact and conclusions of law were filed and judgment rendered for defendants June 29, 1935, and that on July 13 thereafter plaintiff's motion to modify the findings and set aside the conclusions of law, and for judgment on the record, and his motion for a new trial, all of which had been filed in time, were by the court considered and overruled. On September 12, 1935, plaintiff served the notice of appeal and filed the same with the clerk of the court September 18. The notice of appeal is "from all adverse rulings, findings, conclusions and the judgment of the district court . . . in the above-entitled cause." We think this notice sufficient to include the ruling of the court on the motion for a new trial. On this point appellees cite *Hardman Lumber Co. v. Spitznaugle,* 130 Kan. 346, 286 Pac. 235, and *Dolan Mercantile Co. v. Wholesale Grocery Subscribers,* 131 Kan. 374, 291 Pac. 935. In the first of these cases the notice of appeal was from the "judgment" of the trial court, and in the second from the "decision" of the court. Those notices are substantially different from the one before us.

The facts disclosed by the record, including the transcript, court files and exhibits, may be summarized as follows: About 1898 Henry Johnson and his wife Clara moved to Haskell county, then sparsely settled and without a railroad, and when the principal business was raising livestock. They bought a quarter section of land, on which they made their home for many years, and engaged in the livestock

business and farming. In the meantime farming, particularly wheat growing, had become the important industry, a railroad had been built through the county and a new town, Sublette, had become the county seat. The population of the county had increased substantially, but it remained a typical wheat-growing, livestock country. The Johnsons, by their industry and business judgment, had prospered until they owned eleven quarter sections of land and their home in Sublette. They became and were one of the leading, prosperous, substantial families of the county. Mr. Johnson was elected a member of the board of county commissioners, and by reëlection filled that position for sixteen years. The Johnsons moved into their home in Sublette, but continued to operate their farms.

On at least one occasion Mr. and Mrs. Johnson, and others from Sublette, spent a winter, or several months, in California. The Johnsons had no children. Mr. Johnson died in 1925, intestate, and Mrs. Johnson became vested with the title to all of their property, said to be worth more than $60,000 at the then prevailing values—none of which was encumbered. During his last illness Mr. Johnson was a patient in the St. Anthony Hospital at Dodge City, an institution owned by a corporation known as the Sisters of St. Joseph, a Catholic order, and operated by the Sisters of that order. Mrs. Johnson became acquainted with the Sisters then in charge of the hospital. Afterwards, on two or more occasions when she was in Dodge City, she called upon the Sisters at the hospital and visited with them. During Mr. Johnson's last illness his attending physician was Doctor Thompson of Dodge City (since deceased), for years a leader in his profession. Associated with him was a younger man, Dr. Foster L. Dennis. Mrs. Johnson became acquainted with these doctors. Afterwards, on a few occasions, she went to Dodge City to consult Doctor Dennis professionally, and on one or two occasions had him come to Sublette to see her. Dr. L. V. Miner, of Sublette, who had practiced medicine in Haskell county since 1903, was the physician ordinarily called to the Johnson home when one was needed. He had treated Mrs. Johnson both before and after the death of her husband.

Mrs. Johnson greatly grieved over the loss of her husband—not only the loss of his companionship, but in the management of their property. She continued to live in their home at Sublette. Sometimes she had school teachers rooming, or rooming and boarding, with her. Aside from that she lived alone, until sometime in 1931,

when Lawrence Brennan, the plaintiff in this action, began staying with her, under circumstances which will be mentioned later. Mr. Johnson was buried in the Haskell county cemetery. Mrs. Johnson had the lot improved by someone who made a business of that work. A large tombstone, with appropriate inscription, was erected, and a cement slab, ornamented with shells, was placed over her husband's grave. A similar one was placed near by, where she planned her grave to be, shrubbery was set out and grass sown. She visited the grave often and watered and cared for it.

Mrs. Johnson was of a friendly disposition and visited a great deal with the women in her immediate neighborhood, and to some extent with her old friends in the country and near-by towns, and those people visited her. She had a garden and flowers in her yard, where she spent quite a little time. She took an interest in young people, especially those trying to get an education, and sometimes helped them financially. While religiously inclined, she was not a member of any church prior to 1930, but aided church work without showing much preference as to denominations or creeds. She was apparently open-minded as to creeds and made no effort to influence her friends with respect to their beliefs.

After Mr. Johnson's death she looked after her business, which consisted chiefly in leasing her lands, collecting the rents, and making a few loans. Up until 1930 she talked with the leading banker at Sublette, a Mr. Elliott, about these matters, or some of them. He advised her from time to time and assisted her in collecting rents and other sums due her. This appears to have been the character of advice and assistance which a reputable country banker normally gives to his patrons. Occasionally, it seems, she asked other of her acquaintances about specific things. For example, in the spring of 1931, for some reason she wanted a new tenant for some of her land. She spoke to one of her friends, a Mr. Watkins, about it. He recommended a Mr. Turner, who had been farming some of the Watkins' land. As a result she rented Turner several quarter sections, including the home place. She made it one of the conditions of the lease that Turner live upon the premises and care for the improvements. Turner did not do that. She did not like to have her improvements vacant. Early in 1932 she heard of a Roe Bailey, who was wanting to rent land. He had been farming in Stafford county, but his father-in-law, Clarence Haddon, lived near the east line of Haskell county. Through him she sent word for Bailey

to come to see her. Bailey and Haddon did so. She told them the legal description of the land—five quarter sections—how to go to it, what rent she wanted, and particularly that she wanted the buildings on the land occupied. She asked Bailey for references, which he gave her. She told him to see the land, and if he wanted to rent it on the terms she named she would look up his references. Bailey looked at the land and told her he would like to rent it if he could. She told him to come back in a week or ten days. He did so and she told him that she had looked up his references and thought he would be satisfactory, and for him to go to the office of Clarence E. Dennis, an attorney at Sublette, who would·draw the lease. Bailey went there, the lease was drawn, including the terms they had discussed; Mrs. Johnson went there, and they both signed it. Bailey was still occupying the land under this lease at the time of the trial.

Another instance may be noted. Mrs. Johnson had a note for $5,000, secured by a mortgage on some land. It is spoken of as the Haney mortgage. Just when that loan had been made, or under whose advice, is not shown. At sometime in 1931, or early in 1932, it became in default. It seemed the Haneys wanted to sell this land to Mrs. Johnson, have the mortgage applied on the price, and for Mrs. Johnson to pay them some additional money. She talked with two or three persons about that, to Mr. Means, the probate judge, and Ed Johnson (not related to her in any way), who formerly had been sheriff of the county, and had them go to her house and look at her papers. She asked their advice about taking this land, but told them she had all the land she wanted and would rather not buy it. They then advised her not to buy the land if she did not want it. She had a similar talk with another one of her friends. There had been some inquiry about the abstract to the land. She had been asked about it and said she did not have it, but someone looked through her papers with her and found the abstract, which, it appears, she did not know she had. In looking through the papers either she did not know what the abstract looked like, or had overlooked it. Dennis, the attorney, consulted with her about this Haney mortgage, perhaps represented her in connection with it. The Haneys were still urging her to buy the land, pay them something more than the mortgage and take it, and she was declining to do it. It had not been settled at the time she left Sublette. Some of her friends, looking through her papers

with her, found she had not kept them in an orderly manner, but she appeared to have all of them. In the main, the evidence showed her business affairs were conducted about as well as the average person would conduct them.

Late in 1928, her brother, a Mr. Robinson, who lived in Harrison county, Iowa, became seriously ill and died. On learning of his illness she went there. While there, and in November, she had a stroke of some kind. She was treated and cared for there and improved so that she came home in February. Her brother's son, Earl Robinson, brought her to her home. Earl Robinson was a tenant farmer in Iowa. She talked to him about coming to Haskell county and farming a part of her land. He liked the outlook and wanted to do so. At her request he moved to Sublette in June, 1929. He was married and had four children, two boys and two girls. He had no property. For two or three months his family lived with Mrs. Johnson at Sublette. She wanted him to go out on the farm and live, but he did not want to do so, or perhaps, more accurately, his wife did not want to do so. Mrs. Johnson assisted him to buy a home several blocks from her in Sublette, into which he moved and has continued to live. She also assisted in furnishing the home, including a piano for the little girls, and she paid for their music lessons. She also helped him buy implements with which he could farm the land, which he began doing in July, 1929. For a time he farmed three quarter sections and later two additional quarter sections. She let him have additional money from time to time, up to March, 1932. There is no evidence that he repaid any of the money she advanced to him.

In the spring of 1930, Paul Steinberger came to Sublette. It seems that his wife was a cousin of Mrs. Johnson's. He appears to have been getting oil royalty deeds on land, and succeeded in getting one from Mrs. Johnson for a part of her land. Later she consulted an attorney, Mr. Hoskinson, at Sublette, who prepared for her an affidavit to the effect the deed had been procured by false representation. Later Steinberger heard of that, went to see Mrs. Johnson, and succeeded in getting her to make an affidavit to the contrary. Later, however, she employed attorneys and had an action brought, as a result of which the oil royalty deed was set aside. Steinberger appeared to be officious in trying to handle some of Mrs. Johnson's business, with what authority, if any, is not disclosed. Perhaps he had none. About that time, however, she

opened an account at a bank in Garden City. Perhaps Steinberger induced her to do that, although the facts concerning it are not clearly brought out in the evidence. Such account as she had in the Sublette bank was gradually drawn upon until it was exhausted. About the time this account was opened at Garden City Earl Robinson called at the bank at Sublette and got the box containing her papers and took it away. By whose authority, or what he did with it, is not disclosed by the evidence—perhaps he gave it to Mrs. Johnson. At the time Steinberger came there Mrs. Johnson had a Lincoln automobile. When that had been purchased, or how long she had it, is not disclosed by the evidence. It seems that Steinberger represented to her that it needed repairs and needed painting, and pursuaded her to give him several hundred dollars to be used for that purpose. It appears he took the automobile and the money and went away. A witness in this case quoted Mrs. Johnson as having said later that all she had for it was "a piece of paper," and she didn't know whether that was worth anything. It does not appear that plaintiff, or anyone whom defendants charge with fraud, conspiracy and undue influence in this case, was connected in any way with Steinberger or his activities.

In the fall of 1930 the Brennan family, consisting of Mr. and Mrs. Brennan and five children, moved from New Mexico to Sublette. Plaintiff is the third child of that family and was then nearly ten years old. Brennan had an automobile garage and an agency for the sale of Chevrolet automobiles. At first this was a subagency under the Nolan Motor Company of Garden City. Mrs. Brennan is a sister to Mr. Nolan of that company. Later the Brennan agency was independent. Early in 1931 Richwine, a salesman for Brennan, sold Mrs. Johnson a Chevrolet automobile. She did not drive a car, but wanted one to use when she wished to go places. She arranged with Jack Brennan, plaintiffs' brother, then about seventeen years of age, to drive her car for her when she wanted to use it. He worked at the Brennan garage. She kept the car in the garage at her home and kept the key for it on a nail in her kitchen. When she wanted to go any place in her car she sent for Jack Brennan, gave him the key, or had him get it and get the car out and service it, if that were needed, and drive the car where she wanted to go, then to her home when she was ready to go, when the car would be put in the garage and the key where it belonged. The trips were mostly to her farms, to the cemetery, or to near-by towns or places

in the country. Some trips were made to Garden City, where she went to the bank, a few of them to Dodge City, and at least one to Larned, where she visited the family of a minister who formerly lived at Sublette. Perhaps there were others. Jack Brennan continued to act as a chauffeur, of the sort above stated, for Mrs. Johnson for perhaps a year and as long as she lived at Sublette. It does not appear that she paid him for this service; the record indicates he made no charge and expected no pay.

On March 12, 1931, Mrs. Johnson executed a will, the probate of the copy of which was sought to be set aside in this action. The will was executed at Garden City and was prepared in the law office of C. E. Vance, formerly judge of the district court in that district. She was taken to Garden City on that occasion by Clarence E. Dennis, the attorney at Sublette, and was accompanied by Dr. L. V. Miner, who was one of the witnesses to the will. This will nominated Clarence E. Dennis and Earl Robinson as her executors and directed them to cause her remains to be interred in the Haskell county cemetery beside her deceased husband and to place a marker at her grave similar to that for her husband. It bequeathed to William Robinson, the son of her nephew John Robinson, $1,000, and further, if he should attend college after completing high school, directed her trustees to pay to him $100 per month while he was attending college, not to exceed thirty-six months. By the will she gave to Earl Robinson $7,500, with the provision that if prior to her death she should convey to him a quarter section of land such conveyance should take the place of the legacy. She made a similar bequest to Kermit Clark, of Mondamin, Iowa, a nephew of her deceased husband. She gave all of the remainder of her property in trust to Clarence E. Dennis and two other resident taxpayers of Haskell county, to be designated by the judge of the district court, with authority to appoint successors to such trustees. She directed the trustees to hold, care for and manage, and to lease for any proper purposes, including oil, the real property conveyed to them and from the annual income to pay: (1) The necessary taxes and repairs; (2) to the trustees of the Methodist church at Sublette the net income from one quarter section of land, to the trustees of the First Christian church of Sublette the net income from one quarter section of land, and to the trustees of the Church of the Nazarine of Sublette the net income from one quarter section of land, the quarter sections to be designated by the trustees; (3)

to pay the sum of $20 per year to maintain proper care of the lot in the cemetery where she and her husband were buried; (4) the balance of the annual income from her property, or so much thereof as the trustees deemed proper, to be loaned to worthy boys and girls, residents of Haskell county, graduates of high school, and desiring to attend college, the loans to be made on such terms, with or without interest, as the trustees should deem proper; such part of the income which was not so used to be loaned on first mortgages upon real or personal property, or invested in government or municipal bonds. It provided the trust should continue for twenty years from the date of the death of the testatrix and thereafter until it could be disposed of as provided. It authorized the trustees at the end of such twenty years to dispose of all her property, and if within that time the commissioners of Haskell county, or the governing authority of the city of Sublette, had provided to build a hospital costing as much as $60,000 at Sublette, the proceeds of the trust was to be turned over to the authorities constructing the hospital, with the request that it be designated "the Henry and Clara Johnson Memorial Hospital." If in that time neither the county nor the city had erected or planned to erect such a hospital the trustees were directed to use the trust fund in such manner as they deemed best to bring about the erection, equipment and maintenance of such a hospital. The trustees were to serve without pay, but were to be reimbursed for actual expenses.

Within the next few weeks Mrs. Johnson told some of her neighbors that she had made a will, and some outline of its provisions, and expressed satisfaction and her mental relief that she had done so. The fact she had made this will appears not to have been a secret.

After they had lived in Sublette several months the Brennan family moved into a house situated diagonally across the street from Mrs. Johnson's home. It does not appear whether Mrs. Johnson and Mrs. Brennan were acquainted prior to that time. Soon thereafter Mrs. Johnson called upon Mrs. Brennan at her home; later Mrs. Brennan returned the call; the visits became more frequent, and Mrs. Brennan became one of Mrs. Johnson's several neighbors and friends who felt free to run into her home at almost any time, and she into theirs. Among these near neighbors was Doctor Miner, who lived just across the street north from Mrs. Johnson; Mrs. M. A. Cave who lived across the street; Mrs. Linde-

man, who lived directly across the street west; Mrs. Miller, who lived on the lot adjoining her on the south; and some others visited frequently, though they did not live so near her. Because Mrs. Johnson lived alone and found it difficult to cook some things for herself, at times her near neighbors would take her something they had cooked. Mrs. Miner, Mrs. Lindeman, Mrs. Brennan, and perhaps others, did that on occasions.

The relations of the plaintiff, Lawrence Brennan, and Mrs. Johnson are important in this action. He first met her when he and another boy were playing on the street. Mrs. Johnson came along and asked them to carry a bundle to a laundress and gave them a dime, which pleased them. Sometime thereafter Mrs. Brennan was visiting Mrs. Johnson late one afternoon. Lawrence, playing with other boys, got hurt in some way and ran to tell his mother about it. Mrs. Johnson petted and consoled him. A few minutes later, when Mrs. Brennan started to go home, Mrs. Johnson asked Lawrence to stay and eat supper with her. He wanted to stay and his mother permitted it. Through the meal and after Mrs. Johnson and Lawrence talked. She told him of her experiences—living on the farm, raising cattle, and farming, and how the country had developed and changed. It was all exceedingly interesting to Lawrence. Bedtime came; his mother sent for him to come home; Mrs. Johnson asked him to stay all night; said she had a bedroom which was not used, and she would be glad to have him stay so she would not be alone at night. He ran home to ask and plead for his mother's permission, which was ultimately granted. This was the beginning of what grew into a warm personal friendship between them. He was an active, good-looking boy; bright, intelligent, industrious and well-mannered. She enjoyed having him there; he ran her errands, did her chores about the house, and read to her a great deal, all of which she appreciated or enjoyed, and it kept her from being so lonely. He liked to visit with her, was glad to run her errands and do her chores, and to read to her, which he did a great deal. After the first time Lawrence—at Mrs. Johnson's request, which he was glad to accede to—continued to stay with her at nights, with but few exceptions, as long as she lived at Sublette. He was there, also, as much as he could be in the day-time and of evenings; in fact, he practically lived with Mrs. Johnson except that he took most of his meals at home. All of this time

Mrs. Johnson was becoming more and more attached to him, and he to her. To one of her friends, Mrs. Davis, who visited her several times in the spring and summer of 1932, Mrs. Johnson showed nice bedspreads and nice handwork she had done, and some pillow slips and other things in a cedar chest, and said they were for Lawrence, that she was saving them for him. At several times she talked about who would get her nice things and her home when she was gone. From another witness, Phil Beaubien, we learn that early in 1932, perhaps in May, Mrs. Johnson was considering adopting Lawrence as her son, but had not fully decided whether it was the right thing to do. He quotes Mrs. Johnson as having said Mrs. Brennan wanted Mrs. Johnson to adopt Lawrence.

After Lawrence began running errands and doing chores for Mrs. Johnson, Earl Robinson's boys, who had previously performed those tasks, or some of them, found there were none for them to do. As one of them testified, the reason was the Brennan boys "were shoving us out." They still went to see their "Aunt Clara," but not as frequently as before. At the time of her "stroke," August 3, they had not been to see her for more than a month. The Robinson girls went to see her less frequently, and Mrs. Robinson very seldom. Earl Robinson occasionally stopped to see her on his way home from work—sometimes to talk about some business matter, at other times simply to visit. To several of her friends she had expressed dissatisfaction of Earl, in that he was not attending to specific things as she thought they should be attended to. To one of her friends Mrs. Johnson told a story, sometime in the winter of 1930 and 1931, concerning which she grieved seriously, to this effect, that she had the Robinson boys and the Brennan boys clean up her yard; that later one of the Brennan boys told her a Robinson boy had asked him if she had paid him for the work and was told that she had, whereupon the Robinson boy had referred to Mrs. Johnson with a vile epithet, and said, in effect, it didn't make any difference, that she was not going to live very long and that Paul Steinberger "had it all fixed up and they are going fifty-fifty on it when she died." This was interpreted to mean that Paul had it fixed so he and Earl Robinson would get her estate in equal shares.

. By August, 1932, there appears to have grown up a feeling between some of Mrs. Johnson's other friends and Mrs. Brennan; particularly Mrs. Miner and Mrs. Brennan had become unfriendly with each other, though both were friendly with Mrs. Johnson and

she with them. The evidence does not explore this field very fully, but indicates that two reasons were rather prominent: (1) The personal relations which had grown up between Mrs. Johnson and Lawrence, and her talk about leaving property to him, or adopting him; and (2) Mrs. Brennan and her family were devout Catholics; Mrs. Johnson's other friends were Protestants. It does not appear that Mrs. Brennan was aware of any general opposition among Mrs. Johnson's other friends to her, or to her family, for either of these reasons.

The story as told so far leads up to Wednesday, August 3, 1932. The morning of that day Mrs. Johnson was in her garden, when she suffered a stroke of some kind and fell. Neighbors and passersby saw her and took her into her home. Doctor Miner was called. He found her in a coma, which lasted about thirty minutes. The word soon spread, and a number of her neighbors and friends came in. The women seemed to vie with each other in their efforts to aid. The doctor prescribed for her and gave directions which those present endeavored to carry out. Earl Robinson, who was working in the field, was notified. He quit work and came in to render such aid as he could. He and Mrs. Brennan sat up with her that night, and got along harmoniously. Mrs. Brennan thought Mrs. Johnson could be better cared for at a hospital. She asked Earl Robinson if he didn't think so. He was rather noncommittal on the subject, but inclined to oppose the idea. She talked to others about it. Some of them thought she could be cared for all right where she was; some thought the matter should be left up to her. The question whether she should go to the hospital became a town topic. On Friday Mrs. Brennan went to Earl Robinson's home to talk with him about Mrs. Johnson going to a hospital and asked him to consent for her to go. He said he would not consent to it unless she wanted to go. His reason, as he testified, was that he was following the advice of Doctor Miner and that he had not been to see her since the previous morning and did not know what conditions were. The next day he was at Mrs. Johnson's home when Mrs. Brennan came, and he said to her that she would have to give up the notion of taking Mrs. Johnson to the hospital. She replied she had not come over to argue that with him again.

There is testimony tending to show that Mrs. Brennan was not satisfied with the treatment Mrs. Johnson was getting from Doctor Miner, thought the medicine he was having her take was injurious

or poisonous to her; that she went to the office of E. E. English, an osteopath, who was the county health officer, and asked him to take some steps to prevent Mrs. Johnson from taking that medicine. He said that was not within the scope of his work. She then asked him to have Doctor Dennis come to see her, but he thought he should not do that; that late Friday night one of the Brennan boys came to tell him Doctor Dennis was there and would like to see him; that he found Doctor Dennis at his car near the Brennan home; that he stated Mrs. Brennan had sent for him; that after talking about the case for awhile the two doctors went to Mrs. Johnson's home; that Earl Robinson, who was there, hesitated about letting Doctor Dennis examine Mrs. Johnson, but permitted it; that Doctor Dennis examined her and said she had an "auricular fluster," and possibly a stroke; that she appeared to be getting along all right; that the medicine seemed to be all right; that he might change it a little if he were on the case. He told her he did not think it necessary for her to go to a hospital, but if she wanted him to take care of her and would come to Dodge City he would do so.

It appears, also, that a Doctor Ungle, of Satanta, came to see Mrs. Johnson. Who called him, or what he did or said, is not shown.

After about the first day it appears some arrangement was made for Mrs. Dye, an old friend and neighbor of Mrs. Johnson's, to stay with her and look after her through the day, although others came for short periods. It appeared to be the plan to have some other neighbor, first one, then another, come in at night, but this was not always well planned. One, who went to stay a short time one evening about nine o'clock, found all the others were leaving and she was left to stay all night, which she had not planned or come prepared to do. Another, who had been asked to come and stay one night, and who was given her instructions by Doctor Miner, hesitated to carry them out because of her unfamiliarity with the case and what each should do.

The record also discloses that on Saturday, August 6, Earl Robinson talked with some of the county officers about taking steps to keep Lawrence and Mrs. Brennan away from Mrs. Johnson. That evening the sheriff came to Mrs. Johnson's and asked Lawrence to go with him to see his mother. Lawrence went to his home with the sheriff and told his mother the sheriff wanted to see her. The sheriff then told both of them not to go back to Mrs. Johnson's any

more, to stay away from there. He explained this command was not his idea, that he had been instructed by the county attorney to do it, and was simply carrying out instructions. The county attorney at that time was Clarence E. Dennis. Neither Earl Robinson nor Dennis, in their testimony, gave any reason, or any authority, for this action. Lawrence and Mrs. Brennan obeyed the command until the next Monday, when Lawrence, anxious to see Mrs. Johnson, went back. She was glad to see him, and thereafter each night until she went away had him make his bed down on the floor near the door of her room. Mrs. Brennan also went back and helped with the work, as she had before.

Notwithstanding this lack of systematic plan in caring for her, and the cross-currents among her friends, Mrs. Johnson improved rather rapidly. She was dressed and up about the house in a few days, though at first there was a lack of coördination, which affected her walking and her speech. August 8 or 9 she walked down town. A witness, who saw her in the bank and talked with her, noticed she had difficulty in saying just what she wanted to say. The talk about her going to the hospital continued. One witness quoted her as saying Doctor Miner suggested that she go to the hospital at Garden City, if she cared to go to one.

The evening of August 10 she had Jack Brennan drive her car and take her to the cemetery. Mrs. John Schnellenbacher, Mrs. Dye and Mrs. Brennan went with her. While there she pointed out to them the place she planned to be buried, named several persons she wanted for pallbearers, and whom she wanted to conduct her funeral. On August 11 Earl Robinson stopped on his way home from work in the evening and told Mrs. Johnson he would go home, eat supper, clean up and come back. There is conflict in the evidence as to what he told her was his purpose in coming back. His testimony was he told her he was coming to stay with her that night; there is other testimony that he said there would be some men with him, with papers for her to sign so that she could be cared for and her business looked after; that then she would have nothing to worry about. Directly after Mrs. Johnson had her supper she sent for Jack Brennan and had him drive her to the cemetery and from there to Satanta, where she visited until nine o'clock, or later, with Mrs. Jacquart, a friend, then returned to Sublette and stopped at Mrs. Brennan's house, where she visited an hour or more, when she and Lawrence went to her own home for the night. In the meantime,

while Earl Robinson was eating his supper, a neighbor woman came and told him the Brennans had taken Mrs. Johnson away. He got ready and went to Mrs. Johnson's home and found no one there. He then went across the street to the Doctor Miner home and sat on the porch and talked with Mrs. Miner, and perhaps others, until possibly eleven o'clock. "Mrs. Miner said that she was pretty sure they had taken her to New Mexico; they was going to go to New Mexico, and it was all over town."

There is testimony to the effect that Mrs. Johnson told Reverend Hull, who visited her that afternoon, and Mrs. Jacquart, whom she visited that evening, that she was going to the hospital the next day for a few days' rest; that she also told the Brennans and asked Jack to take her.

On Friday, August 12, Earl Robinson went on with his work and made no effort to find out where Mrs. Johnson was until Sunday, the 14th. About ten o'clock in the morning of the 12th Jack Brennan, in compliance with the request made of him the evening before, went to Mrs. Johnson's home. She was ready to go to the hospital, but asked him to drive by the two grain elevators where wheat from her farms was being delivered. He drove her car; Mrs. Brennan and one of her younger children went with them. They went first to the elevators, where Mrs. Johnson inquired about her wheat. At one of them all the wheat had not been brought in; at the other one the wheat had been delivered, but the amount due her had not been computed. There is testimony that she told Sylvia Rathe, employed at one of the elevators, that she was going to the hospital for a few days. They then went directly to the St. Anthony hospital at Dodge City, where she took a room and asked for Doctor Dennis. Mrs. Johnson knew the Sisters in charge of the hospital, they being the same ones in charge when Mr. Johnson was a patient there, and with whom she had kept up an acquaintance. Doctor Dennis told them it was possible she would need to be at the hospital only a few days, and perhaps she would be ready to go home the next Monday. The Brennans returned to Sublette. There is no evidence that they in any way attempted to conceal the fact that Mrs. Johnson had gone to the hospital.

On Sunday evening, August 14, Earl Robinson took three men with him—Ed Watkins, Mr. Phillips and W. O. Kelman—and went to the Brennan home. Mrs. Brennan came to the door. Earl Robinson asked her where she had taken Aunt Clara; she said she had

taken her to the hospital at Dodge City. He said: "What did you sneak off with her for?" She replied that she didn't sneak off with her, and closed the door.

On Monday, August 15, Mrs. Brennan, Jack, and one of the younger children, went to Dodge City for the purpose of bringing Mrs. Johnson home, if she was ready to come. They were told she was not ready to leave the hospital and would not be ready for several days. The Brennans returned to Sublette. On Tuesday morning, August 16, Mrs. Brennan, Jack and one of the other children, driving their own car, went to New Mexico and did not return until late Saturday evening, August 20.

Tuesday morning, August 16, Earl Robinson, with four men whom he asked to go with him—Frank McCoy, W. O. Kelman, Mr. Phillips and Phil Beaubien—went to the hospital, talked to the sisters in charge and to Doctor Dennis, and wanted to take Mrs. Johnson home. Doctor Dennis did not think she was in such condition that she should go. Earl Robinson and the men with him were so insistent on taking Mrs. Johnson home that Doctor Dennis finally called an attorney, Walter L. Bullock, of Dodge City, to the hospital and asked him what his rights were, as Mrs. Johnson's physician. Bullock finally told him to use his own judgment in the matter. Earl Robinson made no effort to see Mrs. Johnson on that occasion. He could have seen her, had he desired, but did request that Phil Beaubien talk with her. The request was granted. Phil Beaubien had come to Sublette in 1930. He was in the oil business; was away part of the time, including the time of Mrs. Johnson's illness in 1932; he had met her a few times; he had met Earl Robinson often, and they had become especially good friends. His talk with Mrs. Johnson that morning was not of much consequence; he was in her room but a few minutes; she was sitting up in bed; he asked her when she was coming home; she said she thought she would be able to come home right away, that she was feeling good that day. The men went away without her.

After Bullock had talked with Doctor Dennis, and as he was starting to leave the hospital, one of the Sisters told him a Mrs. Johnson who was there wanted to see an attorney. He went to her room. She was a stranger to him; he knew nothing about her affairs; neither did he know the Brennans, or anything about their business. A nurse introduced him to Mrs. Johnson and left the room. Mrs. Johnson began to talk about her business affairs. First

she told him about the Haney mortgage, the amount of it, what land it covered, about its being in default, the efforts of the Haneys to get her to buy the land; mentioned the attorney, Dennis, as having something to do with it, complained that it had been dragging along and nothing done, and asked him to look after it for her, which he promised to do. She next told him she wanted to adopt a boy; that there was a boy who had been kind to her for a year or more and she loved him like her own son; that the boy's name was Lawrence Brennan, and she wanted to know about adopting him, what the procedure would be. He asked if the boy was an orphan; she said no. He asked if she could get the consent of his parents, and she said no. He told her she would have to get the consent of the parents before she could adopt the boy. She then wanted to know how she could take care of him; she wanted to do something for him. He suggested she could deed him some property and reserve to herself the use and income of the property during her lifetime. They talked it over and she said she would do it that way. She discussed her property and told him she wanted to deed Lawrence Brennan four quarter sections of land, and gave him the legal descriptions of the land to be put into the deed. She also told him Jack Brennan had been kind to her and she wanted to make a similar deed to him for two quarter sections of land, and gave the legal description of the land for that deed. She also said she wanted to make a similar deed to St. Anthony hospital for two quarter sections of land, and gave the legal description of the land for that deed. Bullock told her he would have the deeds prepared. He went to his office, checked the land descriptions she had given him with a plat of Haskell county, and found she had correctly described land she owned in that county. He prepared the three deeds in accordance with Mrs. Johnson's directions, placing in each of them a clause by which she reserved to herself the use and income of the lands as long as she lived. The next day, August 17, he had H. F. Millikan go to take the acknowledgment. Millikan is a man of high standing, and is well known in southwest Kansas. He had lived in Dodge City many years, but formerly lived in Haskell county, still owns land there, and had known Mrs. Johnson and her husband for many years. Mrs. Johnson was glad to see him. They talked some of old times; she told him what she was doing. He talked with her and asked questions and was confident she fully understood what she was doing, and that she was doing it volun-

tarily.· She executed the deeds and he took her acknowledgments. Bullock left the deeds at the hospital office, one for the hospital, the other two to be forwarded to the grantees named therein.

Some news respecting these deeds appears to have reached Sublette, for the next morning, August 18, Earl Robinson went to Dodge City with several persons whom he requested to go with him, including Clarence E. Dennis, Kelman, Phillips and Watkins; perhaps Claude Cave joined them at Dodge City. They first talked to Millikan, and he told them he had taken the acknowledgment of the deeds. They then went to the hospital, where they talked to Sister Winifred, one of the Sisters in charge of the hospital. Sister Gertrude, the superintendent, was ill that morning. Kelman told her they understood the deeds had been made, one to the hospital. She happened not to know about it and went to find out. She returned shortly with the deed and stated in substance if.the people there were objecting they did not want the deed. Without saying anything to Mrs. Johnson or Bullock about it she gave the deed to Earl Robinson, who handed it to Clarence Dennis. It was received in evidence on the trial of this case. No one claims title to land under this deed. It does not appear that either Earl Robinson, or any of the men with him, saw Mrs. Johnson, or attempted to see her on that occasion.

After executing the deeds, August 17, Mrs. Johnson talked with Bullock about making a will, and said she wanted this boy, Lawrence Brennan, to have the remainder of her property except what she might deed away to others; she was still talking about adopting him. She spoke of Earl Robinson, said she had him come from Iowa and he had farmed her land; that she had spent some $10,000 with him and he had not shown himself capable either of taking care of this money or doing anything with the property; that he was her nephew and when she had him come there she thought she had some relative who would look after her, but she found out that he would not do it. She gave Bullock full instructions for making the will, and spoke of her other relatives and what she wanted to give each of them, how her property should go. She told him she had eleven quarter sections of land in Haskell county, a residence and another house in Sublette, the $5,000 Haney note and mortgage, and several notes, and notes and chattel mortgages, she had gotten through Mr. Elliott at the bank. No one else was present. Bullock did not know any of the beneficiaries she named; no one other than Mrs.

Johnson ever talked with him about the preparation of her will. He had the stenographer from his office come to the room; Mrs. Johnson gave them the data for the preparation of the will; he prepared the will at his office and took it to her August 18, 1932; she took the will and read it and said it was entirely satisfactory. The will was duly executed by her and witnessed. In it she stated her place of residence as Sublette, in Haskell county. By its terms she revoked all former wills made by her; directed her executors to pay her debts and funeral expenses; specifically forgave, released and canceled to Earl Robinson all sums he should owe her at her death, and directed her executors to execute and deliver to him the necessary receipts and releases therefor; she gave $10 each to her nephews and nieces, Earl Robinson, John Robinson, Irene Robinson and Mary Gammet; she gave all the remainder of her property, both real and personal, to Lawrence Brennan. She expressed the desire Lawrence Brennan attend Creighton University at Omaha, Neb., or Notre Dame University of South Bend, Ind., and finish whatever course he might desire; also, that he make arrangements "to take care of my grave, wherever I may be buried." The next paragraph reads:

"It is my desire and intention to legally adopt Lawrence Brennan, as he has lived with me for the last year. I have already disposed by deed of a greater portion of my real property and it is my desire that Lawrence Brennan take the remainder of my property wherever it may be."

She nominated the First National Bank of Dodge City as her executor, and Walter L. Bullock as attorney for the executor.

The record tends to show that soon after executing the will of August 18, 1932, Mrs. Johnson sent for her will of March 12, 1931. She had left it at the bank with which she transacted business at Garden City; that it was sent to her through the First National Bank of Dodge City; that she received it and mutilated it, with the intention of revoking it, by tearing her name off of it, and also by tearing off her initials on each of the several pages of the will. There is not much in the evidence about this. That she did so appears to have been conceded by defendants. Their position throughout was that Mrs. Johnson was incompetent to make a will in the latter part of August, 1932, or to revoke her former will, and that everything she did with respect to those matters was the result of conspiracy, fraud and undue influence of the persons named by them in their answer.

Earl Robinson testified he was at the hospital on Friday or Saturday, and that he saw Mrs. Johnson one of those days, but the testimony does not make it clear who was with him, or just what took place. He also testified to being in Dodge City, with some men from Sublette, on Wednesday, and talking with Doctor Dennis, but not going to the hospital, and that Doctor Dennis told him there would be no business transacted by Mrs. Johnson at the hospital.

Sunday, August 21, Earl Robinson and Mrs. Ida Watkins went to the hospital at Dodge City, reaching there shortly before noon. He asked and was given permission to see Mrs. Johnson alone. What took place between them is not disclosed. Mrs. Watkins asked permission of one of the Sisters to see Mrs. Johnson, and was told she was not having company. Mrs. Watkins found where her room was and went in to see her anyway. Mrs. Johnson told her she had been deeding some of her land. Mrs. Watkins said: "Why did you do that, Mrs. Johnson? That is the wrong thing to do. You need your property. Why deed it to anybody?" Mrs. Johnson replied: "The Brennans and the Sisters make me." She also spoke of wanting to go home. Mrs. Watkins said she and Earl would get some lunch and be back later. Mrs. Watkins testified she and Earl Robinson went to Doctor Dennis' office. Mrs. Brennan was in the doctor's private office, talking loud; one of her boys, "the priest boy," was with her. The door from the waiting room was partly open. While in the waiting room Mrs. Watkins overheard Mrs. Brennan say to Doctor Dennis: "That old Doctor Miner, I'm not going to give Mrs. Johnson up at all, and that old Doctor Miner, he can't have her." She also saw a man there at the office whom she understood was Walter L. Bullock; that after Mrs. Brennan left she and Earl Robinson talked with Doctor Dennis; he said he didn't see any reason why Mrs. Johnson couldn't go home; that he would be over to the hospital at four o'clock to look her over, and if she could go, to check her out. They went back to the hospital at four o'clock; Doctor Dennis did not come until about five. While waiting both of them saw Mrs. Johnson. With Mrs. Watkins there was further talk of the same import about the deeds. Mrs. Watkins asked her about going home; she said she felt so weak, possibly she could go home Tuesday. When Doctor Dennis came he said she was not in condition to go. Earl Robinson and Mrs. Watkins returned to Sublette.

On Monday morning, August 22, the two deeds executed August

17 by Mrs. Johnson to the two Brennan boys, reached the office of the register of deeds at Sublette to be recorded. Earl Robinson and W. O. Kelman learned of it, went to the register of deed's office, got hold of the deeds before they had been recorded and tore them up and threw the pieces away. Word of that action reached Bullock at Dodge City. He took some blank deeds with him to the hospital and told Mrs. Johnson about it. She asked what she could do now. He told her she could make new deeds, duplicates of the ones which had been destroyed. He thought they could be recorded. She said she wanted to do it. Bullock wrote up new deeds there at the hospital, duplicates in every respect of the two which had been destroyed. He called L. S. Myers, who had been in the real estate business at Dodge City more than ten years, to the hospital to acknowledge them. Before that he had done some business in Haskell county and had met Mr. and Mrs. Johnson a few times. When he went to her room at the hospital Mrs. Johnson recognized him and called his name before he recognized her. After some talk of their former acquaintance she told him what she was doing. Bullock handed her the deeds and she read each of them and said they were as she wanted them. She then signed them and acknowledged them before Myers. These two deeds were duly recorded in the register of deed's office at Sublette August 29, 1932, and remained unchallenged until after the death of Mrs. Johnson.

The evening of August 22, at Earl Robinson's request, a large number of people from Sublette, estimated at from thirty to forty-five, went in a body to the hospital at Dodge City to get Mrs. Johnson and bring her home. Among the crowd was the undertaker, Phillips, with his ambulance, and E. E. English, the osteopathic physician, for such professional services as might be required. The reason for taking such a large number, as testified to by Earl Robinson, "was to impress upon the authorities that the people of Sublette thought she was being taken advantage of and to bring her home with us if she wanted to come and was able." By impressing the authorities he meant the authorities at the hospital and the police authorities, "we just figured they would take a hand if anything got bad." This crowd reached the hospital about eight o'clock in the evening and made its mission known, and stayed there until about ten o'clock. Earl Robinson saw Mrs. Johnson that evening. Doctor Dennis did not think she was able to go home. The crowd was not especially disorderly, but appeared to be determined. The men

crowded into the reception room and corridors of the hospital. When nine o'clock, the regular closing time, had passed, Sister Gertrude called their attention to it and asked them to go away. They stayed; some of them went back and forth to Mrs. Johnson's room; they seemed to think they were not ready; they didn't care to leave without her. Their confusion was disturbing other patients. Finally she asked a policeman to disperse the crowd, and he did so. The crowd went back to Sublette. Later that night, about the same number of men, or more—perhaps the same individuals—went in a body to the Brennan home in Sublette and told the Brennans, in no uncertain terms, that they had to move away from Sublette, that the people there would not permit them to live in town. The Brennans moved in a few days. They went to Garden City for a week or so, then rented and moved into a house at Dodge City.

On August 23, 1932, there was filed in the office of the probate judge at Sublette an affidavit charging Mrs. Johnson with being an insane or an incompetent person. The record does not show who filed that affidavit. Bullock learned of this and told Mrs. Johnson about it. She asked him to see Clarence Dennis and Earl Robinson and to tell them that she would deed Earl Robinson a quarter section of land if he would let things stand and quit interfering with her and her property. Bullock sent for Dennis and Robinson. They came to Dodge City August 24. The sheriff of Haskell county, with a lunacy warrant for Mrs. Johnson from the probate court of that county, came with them, but he made no effort to serve the warrant. Bullock submitted Mrs. Johnson's proposition. It was not accepted. Bullock and Dennis discussed the lunacy complaint —the jurisdiction of the Haskell county court to hear it. Bullock contended the jurisdiction was in the Ford county court, since Mrs. Johnson was in that county, and told Dennis if he thought Mrs. Johnson was insane or incompetent he would be glad to have him file a complaint in the Ford county probate court and have the matter determined. Bullock testified that Dennis said, before he did that he would want to be assured the court or commission hearing the case would find her to be insane or incompetent, and that he replied they did not try cases that way in that county. Dennis, in his testimony, denied that he made such a condition to the filing of the complaint. They talked most of the day and accomplished nothing. No complaint charging Mrs. Johnson with insanity or incompetency was ever filed in Ford county, and no hearing was ever had upon the complaint filed in Haskell county. A little later, early in Sep-

tember, when Roe Bailey called upon Mrs. Johnson, she asked him to see Earl Robinson and tell him she would deed him a quarter section of land if he would let things stand and cease bothering her about the disposition of her property. Bailey testified he conveyed that message to Earl Robinson and he said: "You can tell her to go to hell." Earl Robinson, in his testimony, denied he made that reply.

Also, on August 24, two doctors, each of high standing and long experience, for the purpose of a consultation with Doctor Dennis, separately made an examination of Mrs. Johnson, with special reference to her mental condition. Doctor McCarty found her mind was alert, much more so than the average person of her age, and that there was no evidence of insanity or incompetency which would affect her ability to transact business. He found no evidence of nervousness. She had an irregular heart, her circulation was not good, and he recommended rest and quiet. Doctor Hooper found her as mentally alert as any woman of her age; that she was a bright, active woman of seventy-two years of age; that her eye reflex was normal; her superficial reflex normal; that she had no tic, no tremors, no delusions, no hallucinations, no illusions; that her sense of time, place and sequence of events was good. He recommended quiet and rest. She carried on an intelligent conversation; there was no hesitancy or impediment in her speech; she had no mental disorder; no nervousness. He had asked some questions about her life. Among other things she told him she had deeded some land to two boys, and had been criticized for it; that she had helped other boys, now she had no money to give and she thought she would give them this land and they could use it. That was the first he had heard anything about deeds she had made.

Mrs. Johnson was greatly disturbed at the recent happenings at Sublette, the fact that persons there, with no semblance of authority to do so, had torn up deeds she had executed and which had been sent there for record; but more especially the fact that a lunacy complaint had been filed against her there. She feared if she went back there she would be tried and found to be insane and sent to an asylum. She had not planned her finances for an extended stay at the hospital and had paid the hospital charge for the first week. On August 27, as a result of negotiations between her attorney and the head officers of the hospital corporation at Wichita, she entered into a contract with the hospital corporation by which the hospital agreed to furnish her a room at the hospital, and all hospital

care and medical attention, medicines and hospital facilities, but not including services of a physician, as long as she should live, in consideration for which she agreed to convey to the hospital a certain half section of land, reserving the use thereof for her life. This contract was in writing and stated Mrs. Johnson's place of residence to be Dodge City, Kan. She executed the deed mentioned in the contract. She continued to live at the hospital, and the hospital authorities cared for her, as the contract provided, until her death, April 12, 1933.

After the making of this contract the turbulent element of Sublette seemed to quiet down. Earl Robinson, and those whom he got to assist him in his efforts to take Mrs. Johnson back to Sublette, irrespective of whether it was best for her to return there in her physical condition, did not go to see her any more. Several other persons, however, did go to see her and talked with her about her home or some business matter. To each of those persons she said that her home was in Dodge City, that she did not intend to return to Sublette to live. To many of those she said she was afraid to go back to Sublette; "they say I am crazy; they will send me to the asylum," or words to that effect. She made such statements to Roe Bailey on each of the several occasions he saw her from early in September, 1932, to March, 1933; to Mrs. Roe Bailey each of the three or more times she talked with her within that period; to Clarence Haddon, who saw her once after she had bought property in Dodge City; to Mr. and Mrs. Geo. H. Graham, old Sublette neighbors of Mrs. Johnson's, who had moved to Winfield and who visited with her on January 17, 1933, in the home she had purchased at Dodge City; to Will Zurbucken, sheriff of Ford county, who had occasion to talk with her in March, 1933; and to W. W. Dwyer, president of the Dodge City chamber of commerce, and Claude M. Cave, who called to see her in December, 1932.

Mrs. Johnson, accompanied by Mr. Bullock, went to the office of the city clerk of Dodge City September 20, 1932, and registered as a voter, giving her age as seventy-three years and her address as 1800 Central avenue. This is the location of St. Anthony hospital. She voted at Dodge City at the general election in November, 1932. In September or October, 1932, Mrs. Johnson purchased, or traded a mortgage, for a residence property, house No. 1405 First avenue, in Dodge City, and had her household goods and her automobile moved there from Sublette. She thereafter made some arrangement, the nature of which is not shown, for Mrs. Brennan, Lawrence, and

the younger children, to live there. Mrs. Johnson usually stayed there each day, returning to the hospital at night.

When Mrs. Johnson went to the hospital it seems Doctor Dennis prescribed rest and quiet and that she should not have visitors, except relatives. The Sisters told persons who called that she was not to have visitors. The record discloses that the members of the Brennan family observed those instructions until the latter part of September, with possibly two exceptions. Mrs. Ida Watkins testified that late in the afternoon of August 21, when she was at the hospital, she saw Mrs. Brennan in the corridor which led to Mrs. Johnson's room, and Phil Beaubien testified that the second time he was at the hospital and saw Mrs. Johnson, Mrs. Brennan was in the room while he was there. He did not fix the date of that visit definitely, perhaps it was at the time the crowd was there the evening of August 22. Lawrence Brennan had remembered Mrs. Johnson's birthday was September 8 and on that day he took a small box of candy to the hospital and left it at the office to be given her. On September 14 Mrs. Johnson wrote Mrs. Brennan a letter, as follows:

"My Dear Friend and Children:          "HOSPITAL, September 14, 1932.

"I have been very lonely without seeing any of you for so long. Hope it will be so you may come to see me. I want to see Lawrence; tell him thanks for my candy; it was very nice that he even remember when my birthday was.

"I am happy and getting along fine. Am so glad, I got here, and Doctor Dennis and the dear Sisters were able to take care of me so faithfully. It is something terrible, and I am, to stay here with the Sisters for some time. They are dear friends to me. I got a card from Mrs. Nolen. I appreciate their cheering; to think they even thought of me. I will see them some time. I would like to see Jack; I want him to get my car and pay some bills for me; my blanket is at the postoffice, and if he goes to Sublette maybe they can get it for me.

"Love to all of you, I am so anxious about James school again this fall. I think of it at night when I am all alone. I can help him some, but I can't go out to see what I can do. Well, I want to see you so bad, but they tell me here that I can't do anything for a while. Love to all of you folks. From your friend,                         CLARA JOHNSON."

The above letter was written on both sides of a sheet of paper and at the top of the second side was the notation, "Mrs. Johnson to Mrs. Brennan." Thereafter Mrs. Johnson improved so she could leave the hospital in the daytime. Just when she first did this is not disclosed; perhaps the latter part of September. Thereafter it was her practice every day to go from the hospital to the residence she had purchased in Dodge City and where Mrs. Brennan, Lawrence, and her younger children were living, and spend the day there. Fre-

quently they would go up town and about the stores. On one occasion she climbed the stairs to Mr. Millikan's office. This kept up until a week or so before she died. In the meantime she had made arangements for her funeral and burial at Dodge City, and also to have the body of her husband brought to Dodge City and buried with her. She wanted Lawrence Brennan with her as much as she could have him. He was attending school. At her request he was permitted to go to her room of evenings, where he would read to her and visit with her. At the last, when she was confined to the hospital, she kept asking for him more often; was more content when he was there. She was so insistent to have him present that during the last five days of her life he remained out of school and stayed with her. A part of the time she was in a semicoma. She wanted him to hold her hand, and finally died holding his hand on April 12, 1933. The hospital authorities immediately notified Earl Robinson of her death. He went to Dodge City for the purpose of taking her body to Sublette for burial, but learned she had made other arrangements. Her funeral was conducted in the Catholic church. She was buried at Dodge City, and the record indicates her husband's body was brought there and placed beside her.

On April 17, 1933, her will of August 18, 1932, was admitted to probate by the probate court of Ford county. The First National Bank declined to act as executor, and Bullock declined to act as attorney for the executor. An administrator with the will annexed was appointed and a partial inventory of her estate filed, and other proceedings had.

On April 18, 1933, Earl Robinson filed in the probate court of Haskell county a petition for the probate of a copy of Mrs. Johnson's will of March 12, 1931, and alleged that the same was her last will and testament, and—

"That said will has been lost or destroyed and an attempt may have been made to revoke it since the 3d day of August, 1932; that at all times from said last-mentioned date until the time of her death, the said Clara Johnson's health was impaired and her mentality seriously affected; that she was not capable of connected thought or of transacting business, was of unsound mind and easily influenced by anyone with whom she might converse, and if said will was destroyed or attempted to be revoked by said Clara Johnson, such destruction or revocation was the result of her mental incapacity and by influences and persuasions unduly exercised on her by other persons which had the effect of substituting their will for hers."

The copy of the will was admitted to probate. The executors nominated therein were appointed and qualified. This action was

brought to set aside the order of the probate court of Haskell county admitting the copy of that will to probate.

In the lengthy answer filed by defendants, Dr. Foster L. Dennis, Walter L. Bullock, the Brennan family, particularly Mrs. Brennan and the two boys, Jack and Lawrence, and the authorities of the hospital, were charged with conspiracy to prevent defendants and other persons from Sublette from seeing her and in having her execute the deeds and the will executed at the hospital, and in revoking her former will; and also charged that Mrs. Johnson was mentally incompetent to execute such instruments, or to revoke her will, and that she was induced to do so by the fraud, false representations and undue influence exercised over her by the persons named. It further alleged that the probate court of Ford county had no authority to probate the will of Mrs. Johnson for the reason that she was a resident of Haskell county at the time of her death.

The trial court made numerous findings of fact. Plaintiff objected to some of them, moved for their modification, and for additional findings in many particulars. We find it unnecessary to examine *seriatum* these findings and plaintiff's objections to them, for the case is necessarily determined upon the consideration of a few of them.

With respect to Mrs. Johnson's place of residence at the time of her death the court found:

"During her stay in Dodge City, beginning soon after she arrived there, Mrs. Johnson told numerous persons that she expected to go home to Sublette, but also said that she thought the people of Sublette were mad at her; that she didn't have any friends there any more, and was afraid that they would do her harm if they could. She also told others that she did not expect to go back to Sublette."

And in a later finding:

"It is my opinion from the record that Mrs. Johnson never, of her own free will, changed her residence from Haskell county."

Appellant complains of the earlier of these findings, and contends the court should have found, as requested, that during the first two weeks she was in the hospital, to those who called upon her, she spoke of her home at Sublette and of her intention to return to it; that she gave Sublette as her residence in her will executed August 18; but that after the destruction of her deeds and the action of the mob, August 22, and the filing of a lunacy complaint against her at Sublette, August 23, she became afraid to re-

turn to Sublette, and that beginning with August 27, when she executed the contract with the hospital, in which her place of residence was given as Dodge City, Ford county, and which provided for her maintenance there as long as she lived, she claimed Dodge City as her home. Details have heretofore been mentioned of her acts and her statements that her home was in Dodge City and that she did not intend to return to Haskell county. The point is well taken. When a court, in a case such as this, undertakes to make findings of evidentiary facts, such findings should accord with the evidence. The court should have made the evidentiary findings requested. (See *Wisner v. Chandler*, 95 Kan. 36, 37, 38, 147 Pac. 849; also, *Fuller v. Williams*, 125 Kan. 154, 162-163, 264 Pac 77, where other authorities are collected.) In the latter statement the court expressed the opinion that she had not changed her residence "of her own free will." This appears to be an expression of the court's opinion rather than a finding of fact, and indicates the court thought she had changed her residence, but had been influenced against her will to do so by someone, whom the court did not name. In this connection, although it was testified to by one of the defendants, Dennis, the court refused plaintiff's request to find a lunacy complaint had been filed against Mrs. Johnson in the probate court of Haskell county, August 23. This was error. From this record there is no difficulty in determining what caused Mrs. Johnson to change her residence from Haskell county. The lawless act of Earl Robinson and W. O. Kelman in tearing up deeds she had executed; the fact a lunacy complaint had been filed against her there, and the mob psychology which had developed there and which would prevent her from having a fair trial on such a complaint, obviously influenced her to change her place of residence. In explaining why she had changed her residence she frequently said, in substance, "They say I'm crazy; they will send me to the asylum." She perhaps knew, or thought, what everyone else did, that if she were tried on that complaint in Haskell county she would be found insane. Even on the trial of this case, much later, when a jury was requested, on plaintiff's motion the court, without requiring a showing, transferred the trial to another county because of the prejudice of the people of Haskell county. Her refusal to go back to Sublette and be tried on that complaint should be regarded as an exhibition of sound judgment.

Dennis refused Bullock's suggestion that he initiate proceedings

to try Mrs. Johnson for her sanity in the probate court of Ford county, if he thought her to be insane. We pass the controversy between them as to whether Dennis wanted to know before the trial that the judgment would be as he wanted it, and for the purpose of this point will take Dennis's version of it, since that is more favorable to appellees. The fact remains, Dennis did not initiate such proceedings in the Ford county court, which the parties knew and the record discloses was presided over by an experienced lawyer, while the Haskell county court was not. Aside from that, those attorneys needed to have no doubt, and perhaps had none, as to which of those courts had jurisdiction to try Mrs. Johnson on a charge of insanity. Such jurisdiction is in the probate court of the county in which the person charged is found. (*Babb v. Carson et al.*, 116 Kan. 690, 691, 229 Pac. 76; *Beeler v. Beezley*, 126 Kan. 268, 267 Pac. 1112.) Plaintiff offered evidence tending to show that as late as March, 1933, the sheriff of Ford county placed a guard over Mrs. Johnson for several days because of information that had come to him to the effect that Earl Robinson had planned to take her by force to Haskell county. The trial court refused to permit much of this proffered evidence because it did not go far enough to connect any of the defendants up with it. Plaintiff produced an affidavit of the sheriff on the hearing of the motion for a new trial which contained his rejected testimony, but it still lacks the necessary connection with defendants, and we disregard it so far as they are concerned. No doubt there was a plot to return her to Haskell county, but the sheriff's testimony as to who originated it, or its real purpose, was based upon hearsay, and was properly excluded.

The trial court held, as a conclusion of law, that Mrs. Johnson was a resident of Haskell county at the time of her death, April 12, 1933. This conclusion is not supported by any substantial, competent evidence and must be set aside. The evidence of her contract with the hospital, her registration and voting as a resident of Dodge City, her purchasing and furnishing a residence, and her numerous declarations that she had changed her residence to Dodge City and never intended to return to Haskell county, supply all that the law requires to effect a change of place of residence. (*Ford, Adm'x, v. Peck*, 116 Kan. 74, 225 Pac. 1054. See, also, 19 C. J. 440; 9 R. C. L. 542, and cases there cited.) The fact that she sometimes stated the reason she had changed her place of residence does not

overcome the fact that the change was made. Most people when they change their residence have a reason for doing so. Mrs. Johnson appears to have had a good reason, but whether she did or not was her concern, and not the concern of this court or the trial court, or of the parties to this action.

With respect to the conspiracy charged by defendants the court found:

"There is nothing in the record to show a conspiracy between the Brennans, Doctor Dennis, the Hospital and Walter L. Bullock, but I am convinced from the record in this case that both Doctor Dennis and Mr. Bullock were interested in the disposition of Mrs. Johnson's property, and were exerting their efforts to prevent Mrs. Johnson from doing anything that would mitigate [militate] against their interests, . . ."

The court was correct in finding there was no evidence of the conspiracy charged. We are unable to find anything in the record to justify the court's statement that he was convinced that Dennis and Bullock were interested in the disposition of Mrs. Johnson's property and were exerting their efforts to prevent her from doing anything which would militate against their interests. So far as this statement applies to Doctor Dennis it appears to be void of any support. It does not appear that at any time he had any interest in her property, or in her disposition of it other than the fact that he may have charged fees and was paid for his services as a physician. Even evidence of that is lacking. There is testimony that on the evening of August 22, when the large crowd was at the hospital to take Mrs. Johnson home, that Doctor Dennis and one of the Sisters in charge of the hospital gave Earl Robinson, or someone who was with him on that occasion, a written statement, spoken of as "Exhibit 6," but we do not find it in the transcript or among the files or exhibits sent to us. The testimony indicates it was to the effect that Mrs. Johnson would not execute any more instruments respecting her property while she was at the hospital. There is no intimation in the testimony that Doctor Dennis, or the Sisters, had any authority to act for Mrs. Johnson in respect to that matter, or that Mrs. Johnson or her attorney, Mr. Bullock, ever made any such statement. More than that, the deeds to the Brennan boys and her will had been executed prior to that time. With respect to Bullock, the record also is barren of evidence to sustain the finding. It discloses that he was called by one of the Sisters and told Mrs. Johnson wanted to see an attorney, and he went to her room. She

was a stranger to him; he knew nothing about her affairs, did not know Earl Robinson, or any of the Brennans. None of them had ever talked to him about her or her business. He talked with her, advised her, and transacted business for her very much as any other attorney would do under like circumstances. True, the will he prepared nominated him as attorney for the executor. There was no showing that he suggested that; in fact, the evidence is that she told him what she wanted in the will. He declined to take the appointment as soon as the will was offered for probate. While he was a witness on cross-examination he was asked about a deed of Mrs. Johnson's to him for a quarter section of land. He testified he never drew such a deed, that he knew nothing about it, and claimed no title to the land if such a deed existed. He finally did say if there was a deed out that gave him some land he would not refuse to take it. His testimony was that he was paid his fees for his services as an attorney. The amount of them was not stated; there is no contention they were unreasonable. It is suggested by appellees that Bullock was responsible for Mrs. Johnson registering as a voter in Dodge City. He did accompany her to the city clerk's office the day she registered. While there is no evidence on the point it is quite possible that he told her that would be one way in which she could make a public record of her declaration that she was a resident of Dodge City, but she is the one who registered and voted.

The trial court also made the following material findings:

"15. Mrs. Johnson had formed a considerable attachment to Lawrence Brennan and John [Jack] Brennan, and their mother. Due to this attachment Mrs. Brennan was able, by misrepresentations, to turn Mrs. Johnson against her friends and relatives, without just cause, and at the time of the making of the will on August 18, 1932, Mrs. Johnson believed that her friends had turned against her and was thereby induced to dispose of all of her property in a way that she would not otherwise have done. Mrs. Johnson never discovered this deception up to the time of her death.

"16. At the time she executed the will in Dodge City on August 18, 1932, Mrs. Johnson was competent to make a will, if left to her own resources, but was easily influenced as above shown, and the will she executed showed an unnatural abandonment of all her former associates and friends and even the grave of her deceased husband, and the court believes and finds that the execution of such will was the result of the situation in which she was placed by being removed to Dodge City and of the acts and wishes of Mrs. Brennan and Jack, and not the result of the free and unrestrained exercise of her own mind and wishes."

The court correctly found that Mrs. Johnson had formed an attachment for Lawrence Brennan. As early as May, 1932, she was considering adopting him. Thereafter, and before her illness, she talked several times to one of her friends, a witness called by defendants, about Lawrence Brennan and how much she thought of him, showed bedspreads and other nice pieces of work she had made and was saving in a cedar chest for him, also spoke of her home as though she would like for him to have it. She told her attorney the first day she met him about Lawrence and that she loved him as her own son; that she wanted to adopt him; that his mother would not consent; nevertheless that she wanted to provide for him. To a number of persons thereafter she stated she wanted to adopt him; that she had given him some land by deed, and that she was going to give him more property; that he was her ideal of what her own son would have been if she had had one. To Mr. Cave and Mr. Dwyer, who saw her in December, she told that she was studying the doctrines of the Catholic church; that it was a good deal like going to school; that her reason for doing it was that she wanted to adopt Lawrence Brennan as her own son. He appears to have been the only child she ever took sincerely to her heart, although she was friendly to other children. With that feeling toward him there is nothing unnatural in the provisions of her will made at Dodge City by which she gave to him the bulk of her property. Jack Brennan also had been kind to her and had acted as her chauffeur, as previously stated. She also had him help her, to a small degree, in some of her business matters, to the extent, at least, that he sometimes wrote her checks, when she went to pay her taxes and at other times, but he never signed one; she always signed them. No doubt she was somewhat attached to him, but not to the degree or extent she was to Lawrence. We are unable to find support in the evidence for the statement that due to this attachment Mrs. Brennan was able, by misrepresentation, to turn Mrs. Johnson against her friends and relatives without just cause. The court does not find what such misrepresentations were, and we discover none in the evidence, unless it was this: Mrs. Brennan and Mrs. Miner had become unfriendly; for what reason is not disclosed. One day during Mrs. Johnson's illness in August, 1932, Mrs. Brennan and another woman were in the room with Mrs. Johnson. Mrs. Miner and someone else were in the kitchen. It seems Mrs. Miner is hard of hearing and talks a little loud. Mrs. Brennan made what might be characterized as a "catty" remark about Mrs. Miner and her voice. Mrs. Johnson

reproved her for it, said she wished she wouldn't talk that way, as she regarded Mrs. Miner and Doctor Miner as her good friends. Mrs. Brennan replied: "They are just trying to pull the wool over your eyes." It is not shown that this had any effect on Mrs. Johnson's friendship for Mrs. Miner; rather, that it tended to make her think less of Mrs. Brennan. No other instance is disclosed by the record wherein Mrs. Brennan was disrespectful in any way to any of Mrs. Johnson's friends, or said a word against them. So far as misrepresentation about her relatives is concerned, the record discloses but one instance of Mrs. Brennan saying anything to Mrs. Johnson about Earl Robinson or his family. That was one evening during her illness in August, 1932. A neighbor had come to spend a short time in the evening. About nine o'clock she found the other folks there (Mrs. Brennan was not among them) had left. She was alone with Mrs. Johnson. About half an hour later Mrs. Brennan came in and began to rub Mrs. Johnson's arm and side. While doing so she talked to both of the other women and spoke of Earl Robinson and said Mrs. Johnson had done enough for him and his family; had helped them get a home and furnish it, and they did not act as if they appreciated it, and that Mrs. Johnson's reply indicated she agreed with her. Mrs. Brennan testified to a different version of this incident, but we pass that, for it is the trial court's function to determine what the facts were on the conflicting evidence. In the first place this could hardly be called a misrepresentation. Previous to that time Mrs. Johnson had made similar complaints to her other neighbors about Earl Robinson, and later made them more specifically to her attorney. There is nothing to indicate that what Mrs. Brennan did on either of those occasions was done for the purpose of having Mrs. Johnson believe her friends had turned against her, or of having any effect upon the disposition of her property. In short, the court's finding No. 15 is largely taken from generalities, rather than from evidence shown by the record.

The court correctly found that Mrs. Johnson was competent to make a will on August 18, 1932. The evidence overwhelmingly supports that finding. But the court added, "if left to her own resources." The evidence does not show that the making of this will emanated from any source other than Mrs. Johnson herself. The record does not disclose that anyone knew she contemplated making a will until she talked with Bullock about it, or had talked or made any suggestions to her about it. Obviously the moving force which caused her to make this will was the love she had for Lawrence

Brennan; childless herself she had grown to love him as her own son; to think of him as her ideal of what she would have liked in a son of her own; and she wanted to provide for him as a mother would for her sole child to whom she was warmly attached. There was nothing unnatural about it. The court further adds, "but (she) was easily influenced as above shown." This refers to the fact that Paul Steinberger had taken advantage of her early in 1930 and had succeeded in getting an oil royalty deed and her Lincoln automobile by false representations. So far as the oil royalty deed is concerned, the record discloses it was not unusual for such deeds to be obtained in Haskell and nearby counties from competent people by such misrepresentations as later justified a court in setting them aside in an action brought by the grantor for that purpose. In that respect Mrs. Johnson was among the persons with whom that was done. With regard to the Lincoln automobile, the record indicates that was a type of planned theft which varied only in detail from many others. It should be noted when she had time to reflect on those matters her judgment was sound. There is other evidence that she had a mind of her own and used it intelligently; for example, when Mr. Watkins recommended Turner as a tenant and she leased to him and he proved unsatisfactory she made her next lease herself; when Mrs. Brennan made an unkind remark about Mrs. Miner she rebuked her for it; when Earl Robinson stopped and told her he would be back to her house after supper obviously she did not want to see him and deliberately planned to be away until late. The court further found the will "showed an unnatural abandonment of all her former associates and friends." She owed them no duty to give them her property; it really shows the love she bore to Lawrence Brennan. "Even the grave of her deceased husband." This is an inaccurate statement. At the time she made this will she had not planned to move her husband's body, nor in any sense had she given up his grave. The will gave her place of residence as Sublette. Her notion of changing her residence from Haskell county had not then developed. The finding that the will "was not the result of the free and unrestrained exercise of her own mind and wishes" finds no substantial support in the evidence.

In this state what constitutes undue influence sufficient to set aside a will is quite well settled. The decision of this court in *Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634, has been repeatedly cited with approval not only by this court but by the courts of

other states, and by the authors of encyclopedias and textbooks on wills. It was there laid down that to destroy a will undue influence must amount to coercion or constraint which destroys the testator's free agency, and by overcoming his power of resistance obliges him to adopt the will of another instead of his own. It must be brought to bear upon the testamentary act, and particular parties must be benefited or disfavored as a result of the purpose and pressure of a dominating mind. "Fraud" in connection with undue influence indicates something sinister is involved which prevents the testator's will, by overcoming his power, truly to express his real desires. He who alleges such undue influence and fraud has the burden of proof. The proof must be substantial, so that judges of the facts, who know what undue influence is, may see by whom and in what manner it has been exercised. In making such proof he is not limited to bare facts, but is entitled to legitimate inferences drawn from established facts. Nothing approaching this standard is shown by the evidence in this case. Suspicion, or conjecture that fraud or undue influence has been exercised, are insufficient. Power, motive and opportunity to exercise undue influence alone do not authorize a finding it has been exercised. These are as far as the defendants got in their proof in this case. The natural effects of friendship, kind deeds and love, are never regarded as undue influence, although they may have prompted the disposition made by the testator of his property. That appears to have been what prompted Mrs. Johnson to make the disposition of her property she did make by her will of August 18, 1932.

Appellees do not refer to the Ginter case, *supra,* or the long line of authorities in accord with it. They argue that undue influence and fraud need not be shown by direct evidence, but may be shown by circumstantial evidence, citing *Colvin v. Colvin,* 128 Kan. 691, 280 Pac. 763, and other authorities of like import. That is a well-established rule of law and was recognized in the Ginter case, but it does not dispense with proof of the type required by that case. It does not authorize the substitution of such proof by a showing of opportunity, and by suspicion, speculation and conjecture. Appellees in their brief point out a number of bits of testimony which they argue are sufficient to sustain the judgment of the trial court. We think we have mentioned all of these in our recital of the evidence; possibly one or more have been overlooked, for it is impossible to incorporate in the opinion all the evidence in the record.

One of the strongest bits of testimony on which they rely is that of Mrs. Ida Watkins, to the effect that on Sunday, August 21, 1932, when Mrs. Johnson told her of having deeded some of her land, and Mrs. Watkins had criticized her for it, she replied she had to do it—"The Brennans and the Sisters make me," and other statements later that day to the same effect. This testimony is evidence of the fact that Mrs. Johnson made those statements, but is not evidence that the Brennans or the Sisters made her do anything. See authorities collected in the annotation on this point in 79 A. L. R. 1447, 1449. The trial court correctly understood this rule of law and embodied it in an instruction to the jury.

From what has been said the judgment of the court must be reversed and the case remanded with instructions to render judgment for plaintiff. It is so ordered.

HUTCHISON, J., dissenting.