No. 28,698.

Hattie Colvin et al., *Appellees*, v. Albert A. Colvin, and Frank Webb, as Administrator, with the Will Annexed, of the Estate of Mary F. Colvin, Deceased, *Appellants*.

(280 Pac. 763.)

Opinion filed October 5, 1929.

*Dennis Madden,* of Topeka, for the appellants.

*C. B. Crawley,* of Howard, and *Chester Stevens,* of Independence, for the appellees.

The opinion of the court was delivered by

Hutchison, J.: This is an action against Albert A. Colvin by his two brothers and the heirs of a deceased brother to contest the will of Mary F. Colvin, his mother, in which she devised to him all of her undivided interest in a two-hundred-acre improved farm in Elk county, Kansas, estimated to be worth about $12,000, giving the other sons and children of the deceased son $5 each.

The petition charged at considerable length undue influence over the deceased by Albert, who resided with her and farmed the place.

The will was written August 6, 1924, and the testatrix died December 24, 1926. The answer of Albert was a general denial. The administrator of the estate was made a defendant, and he also filed.

a general denial. The cause was tried during the September, 1927, term by submitting the question of undue influence to a jury which on September 27, 1927, returned an answer that the will was executed under undue influence. Motions were filed to set aside the finding of the jury and to grant a new trial. These motions were overruled on May 14, 1928, and at the same time the trial court adopted the finding of the jury as the finding of the court and held the will of the deceased to be null and void because of the undue influence of Albert, her son, exercised by him over her at the time the writing was executed. From this ruling the defendants appeal, assigning error in overruling the demurrer to plaintiff's evidence, in the admission and exclusion of evidence, in approving finding of jury and in overruling motion for a new trial.

There is presented a preliminary question in the form of a motion by the appellees to dismiss the appeal because the appellant, Albert A. Colvin, had prior to taking an appeal voluntarily conveyed to strangers all his right, title and interest in the subject matter of the action. The evidence upon the motion shows that on March 27, 1928, he gave a quitclaim deed to his interest in this farm to Guy and Marion Beck; that the deed was placed on record two days later; that the Becks gave a quitclaim deed of the property to one J. F. Spray on June 30, 1928; that Spray on September 18, 1928, gave quitclaim deed of the property to Albert A. Colvin; that on May 14, 1928, the same day judgment was rendered holding the will null and void, a partition action was commenced against Albert in which he filed answers June 9 and 11, 1928, disclaiming any interest in the land in question; that J. F. Spray was permitted to answer in the partition suit and did so on August 29, 1928, claiming to be the owner of the land. Two notices of appeal were served by appellants on appellees; one on September 14, 1928, the other on November 2, 1928. The appellants filed affidavits made by Albert A. Colvin and J. F. Spray showing that the quitclaim deed to the Becks was given as security for a loan, that Spray took an assignment of the debt and a quitclaim deed as security therefor and that the quitclaim deed was made by Spray to Colvin the day the indebtedness was paid, viz., September 18, 1928.

From these dates it will be observed that appellant gave the quitclaim deed between the time the jury made its finding and the rendition of judgment thereon by the court, and when appellants served the first notice of appeal Spray was the owner of the land, and when appellant Colvin filed his disclaimers in the partition suit

Spray was the owner and he so answered in that case, but when appellants served the second notice of appeal Albert had a deed from Spray.

This question of the right of a party to appeal after transferring his interest in the property involved in the judgment is a very serious one, and it has been well briefed on both sides, but there is one feature of the case supported by affidavits uncontradicted which changes the effect of the original quitclaim deed from a conveyance of title to a conditional one or mortgage. And while the answers in the partition suit disclaiming interest are somewhat inconsistent with the theory now maintained in the affidavits, the practice of giving a deed as security is very common, and it is very improbable that the grantees would make such an explanation if they were actual purchasers. We accept the uncontradicted statements contained in the affidavits that the quitclaim deed from Albert to the Becks was only a mortgage to secure an indebtedness and the subsequent deed to him was in effect a release thereof. When he served the second notice of appeal, which was within the statutory time, he had the deed or release from Spray. And upon this theory he all the time had a conditional interest in the land, that of mortgagor, and before the service of the second notice of appeal the same interest that he had at the commencement of the action.

"A mortgagor or mortgagee may appeal or sue out a writ of error to reverse a judgment, order, or decree in relation to or affecting the mortgaged property if he is a party, when this is required by the statute, and if he has an interest and is prejudiced or aggrieved by the judgment, order, or decree, but not otherwise." (3 C. J. 643.)

On this theory or explanation of the deed given to strangers to the action and with the thought in mind that appeals are to be favored to the extent of affording a reasonable opportunity to review the errors assigned, we have no hesitancy in overruling the motion to dismiss the appeal.

John Colvin, the husband of Mary F. Colvin, was the original owner of the property here involved. He died intestate about 1900, leaving Mary F., his widow, and five sons. When one of the sons died shortly thereafter unmarried and without issue the widow became the owner of an undivided six-tenths of the property. When the husband and father died the land was well improved with fine, large buildings and with no indebtedness except $700, balance for lumber in new barn. He was also possessed of farm equipment, 24 cattle, 18 horses and 12 hogs.

The sons all worked on the farm for a few years, but later one by one they went elsewhere; Albert also going to Illinois for quite a while, but later returned and took charge of the place by oral agreement with the brothers that he stay at home, look after the mother, keep up repairs, pay the taxes and enjoy the profits, and after the mother's death the property would be divided. There were at that time 153 hogs, 40 head of cattle and 24 or more horses. Albert soon became financially involved and changed the arrangement with his mother to an annual cash rent of $300, which he failed to meet, and at length gave her a deed to his one-tenth interest in the property because of his inability to pay the rent, but continued in charge of the place, selling off the stock from time to time, and on June 30, 1924, filed a petition in bankruptcy. Before the bankruptcy proceedings one judgment creditor levied execution upon Albert's one-tenth interest in the farm and the sheriff advertised it for sale. The mother procured an injunction on her verified petition, which set out the relations between herself and Albert concerning his failing to pay rent and attempting to borrow money from her and her finally acceding to his wish by loaning him money and later getting a deed from him for his undivided interest in the farm. One paragraph is especially important to have literally, which follows her statement in the injunction petition of his urging her to make him a loan. It is as follows:

"Plaintiff informed him that she would not accept it or advance any more money to him except upon the distinct condition that his interest in the estate should stand charged as security to her for the payment of said money and interest, because she had never loaned or advanced any money to the other children and she wanted all of them to share alike in the estate when it is ultimately divided; to which condition the said Albert A. Colvin then and there consented and agreed before the delivery of said note."

This petition was verified and filed February 22, 1923.

The evidence shows that Albert apparently conducted all the business in connection with the farm; that he signed his mother's name to the assessment returns, but the administrator reported no personal property whatever as belonging to her; that when a married brother was ill, and frequently requested money, his letters were not answered by Albert. The mother procured a neighbor to write a letter for her to the widow after the son had died. Letters and telegrams requesting information about his mother's last illness were not answered by Albert, and inquiries had to be made of others.

The mother died about ten o'clock in the forenoon and the undertaker testified after his arrival Albert went to town, and the record shows the will was presented by him to the probate judge for probate about one o'clock that day. One instance is given of the mother wanting to help him pay a certain bill shortly before the instituting of the bankruptcy proceedings and his directing her to not do so. They lived alone; they seldom called on any neighbors and the neighbors seldom called on them or either of them. The mother was only seen in town a very few times in the last fifteen years of her life. She is described by witnesses as being "simple, gentle and retiring." "I never knew of her having any business experience." "I did not see her in church for a good many years." "Mrs. Colvin was very quiet and retiring; she was not an aggressive woman; Albert was in charge of the business." "She was a home-loving woman, very industrious in her home and set in her affections. She never had any controversies with any of the neighbors to my knowledge." "She was very affectionate toward her children. She never showed any preference or a different affection for any of them as opposed to the others." She lacked a few days of being seventy-five years old at the time of her death.

Albert was very illiterate, as shown by the letters written to one of his brothers on business, and very emphatic in his positions and severe in his criticism of any deviation from his orders as to the handling of their joint property interest. He was in charge of the farm and lived with his mother for about fifteen years before her death. He is described by some of the witnesses as being "a man of decision," "was aggressive, active, vigorous and determined in his undertakings," and "was very determined in his transactions. I would say he was an obstinate man and was inclined to have his own way." "Albert's attitude was not very friendly." "He was determined in that he wanted to accomplish whatever he set out to do." "He has a stubborn and set disposition and is very determined." One witness testified that "Albert said that when he was served with the writ, notifying him to pay up [on the Thompson judgment] his mother felt bad about it and wanted to pay it. He made a motion with his hand and said, 'You just sit back; I am taking care of this.'" He saw no need of sending a telegram to his brother John about his mother's death.

A number of witnesses testified in defense that Albert was always

agreeable, not hard to get along with, treated his mother nicely, that he was not overbearing, tyrannical or domineering and dealings with him were satisfactory and agreeable. A neighbor testified that the deceased asked him to tell the attorney she wanted him to come and write her will, which he did. The attorney testified that he went in response to such request, talked to her alone about the disposition of her property and testified that she said that "she wanted her son Albert to have the farm and the personal property; . . . that the other boys had left home early and that Albert should have the property." Attorney says he told Albert to get two witnesses, which he did; that he read the will to her and she signed it in his presence and in the presence of the two witnesses. The two witnesses state the same about being brought there for that purpose by Albert and heard the will read to the testatrix by the attorney and saw her sign it in the presence of all three of them. All three say Albert was not present at the conference or signing.

The first assignment of error is in overruling the demurrer to plaintiff's evidence. It is correctly argued by the appellant that there is no presumption of the exercise of undue influence even when a fiduciary relation exists as in this case, when the evidence affirmatively shows that she had independent counsel to advise her. On the other hand, the presumption is in favor of the validity of the will when it has been regularly admitted to probate in the proper court, as this will was admitted. So there is no question in this case as to any presumption being in favor of the plaintiffs, but in fact the presumption is against them and the burden of proof is upon them to establish by a preponderance of the evidence that there was in fact undue influence exercised over the mother by the son in the execution of the will. No witness has testified directly to the exercise of such influence, and indeed it is not often or natural that such influence is a possible subject of direct testimony. It is usually established by the surrounding circumstances and conditions.

"In making his proof a contestant is not limited to the bare facts which he may be able to adduce, but he is entitled to the benefit of all inferences which may be legitimately derived from established facts." (*Ginter v. Ginter*, 79 Kan. 721, syl. ¶ 5, 101 Pac. 634.)

"It has been held that in order to establish undue influence sufficient to avoid a will, the circumstances of its execution need not be inconsistent with every other hypothesis. All that is necessary is that the evidence of the party attacking the will of a person of sound mind, on the ground of undue influence,

shall preponderate over the evidence adduced and the presumptions prevailing on behalf of the proponents of the will." (28 R. C. L. 401. See 40 Cyc. 1144.)

There was in the case quite convincing testimony to the effect that the mother was a quiet, unobtrusive, agreeable, kindly, affectionate old lady, interested in all her children and expressing herself on more than one occasion as desiring to treat them all alike in the disposition of the property. There is also an abundance of testimony as to Albert being determined, set in his way, obstinate and not very friendly. His own letters to his brother John are the best evidence of his determination along business lines and reflect a disposition of disregard for the judgment or wishes of others. The commanding and directing attitude is forcibly shown in his own statement of how he suppressed his mother's inclination to pay one of his pressing debts. He evidently had then in mind the better way of settling it by bankruptcy proceedings instituted very soon after the incident. The jury and trial judge heard the testimony, saw the witnesses and found Albert had exercised undue influence over his mother in the execution of the will and the only duty of this reviewing court in this particular is to say whether or not there was sufficient evidence to support such a finding. We have no difficulty in this particular in finding in the record more than enough evidence, if believed, to support that finding, and hence in our judgment there was no error in overruling the demurrer to plaintiffs' evidence.

The next assignment of error is in the admission of evidence. Our attention is especially directed to two items of evidence that should have been excluded as appellant contends. One item was that with reference to an oral arrangement between Albert and his brothers when he took charge of the place, about caring for the mother, keeping up the improvements, paying the taxes and receiving all the profits during the life of the mother, and at her death the property should be divided. It is correctly urged that this arrangement not being in writing is not enforceable. Whether enforceable or not it goes to show a change of plans on the part of the appellant, for this oral arrangement was not disputed. He changed his mind on the subject of dividing the property as is evidenced by a number of incidents in his relations to his brothers during the last few years of his mother's life, and the evidence shows by the making of the will she changed her mind as very forcibly expressed a short time before. For the purpose of showing this

change of mind on his part and then on her part, as reflected by the will, this evidence was competent although the contract might not have been an enforceable one. Terms of incomplete or proposed contracts are admissible in evidence if they are germane to the issue, although not enforceable as a contract. In the same connection was the other item of evidence, viz., the mother's statements made shortly before executing the will, one statement in conversation, the other in writing duly verified, that she wanted the property to go to all the children alike. This evidence was admissible for the purpose of showing the state of her mind. (See *Fairbank v. Fairbank*, 92 Kan. 45, 46, 139 Pac. 1011.)

The Pennsylvania case cited by appellant on this subject, being a case almost exactly like this one, does not hold such evidence is incompetent, but the reviewing court reversed that case because the trial court failed to instruct the jury that such evidence did not go to the question of undue influence. The following is the third paragraph of the syllabus in that case:

"In an issue raised upon the question of fraud and undue influence alone, though a testator's declarations cannot have any force whatever in establishing the facts of fraud or undue influence, yet if they are reasonably connected in point of time with the testamentary act, they are admissible as tending to show the state and condition of the testator's mind." (*Herster v. Herster*, 122 Pa. St. 239, syl. ¶ 3.)

This brings us to the consideration of the instructions given in the case at bar. There is an element of uncertainty as to the exact language of the instructions, the original instructions being lost, but regarding those submitted in the abstract as substantially correct, the court so clearly defines undue influence and describes what is necessary to constitute such, that by the very terms of such definition, the evidence to which the appellants object is necessarily excluded from that which shows or tends to show undue influence.

What has been said about the sufficiency of the evidence as against a demurrer under the first assignment of error applies without restatement to the last assignment of error in approving the finding of the jury and in not granting a new trial. We find no error as to either ruling.

The judgment is affirmed.