(865 P.2d 1062)
No. 68,912

In the Matter of the Estate of LUCILLE S. BENNETT.
Petition for review denied 254 Kan. 1007 (1994).

Opinion filed December 30, 1993.

*Alexander B. Mitchell II, David D. Broomfield,* and *Mark J. Lazzo,* of Klenda, Mitchell, Austerman & Zuercher, of Wichita, for appellants Leonard Lebow and Shirley Lebow Hellman.

*Stephen L. Griffith,* of Stoel, Rives, Boley, Jones & Grey, of Portland, Oregon, and *J. Michael Kennalley,* of Hershberger, Patterson, Jones & Roth, L.C., of Wichita, for appellants Wendy and Heather Lebow.

*Thomas D. Kitch* and *Lyndon W. Vix,* of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellee Leonard Ropfogel.

*Jeffery L. Carmichael* and *Dennis M. Feeney,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellees Sonya Ropfogel, Phillip Weingarden, Paul Weingarden, Robert Weingarden, and Joyce Weingarden.

Before LEWIS, P.J., GREEN, J., and DAVID L. THOMPSON, District Judge, assigned.

LEWIS, J.: The contestants of the last will and testament of Lucille S. Bennett, deceased, appeal from the decision of the trial court admitting her will to probate.

The trial in this matter was lengthy, complex, and well conducted by all parties. The estate has a value in excess of $50 million.

Lucille and Henry Bennett were married in 1943. The marriage was the first and last for each and was childless. Lucille had two sisters and two brothers, all of whom predeceased her. Henry had two brothers and two sisters. None of Henry's siblings survived Lucille.

During their marriage, Lucille and Henry lived very simply and very frugally. Theirs was an old-fashioned type of relationship

in which Lucille apparently paid no attention to financial matters and was led to believe that she and Henry were living on very limited assets. Henry apparently encouraged Lucille to believe that the parties were "hard up" and were barely eking out an existence on his meager earnings. They lived in an unpretentious home, drove an old car, and apparently counted their pennies in their day-to-day existence.

Unbeknownst to Lucille, Henry was building a rather large fortune in his business endeavors. He made a great deal of money in the oil business and, thereafter, invested wisely in stocks, bonds, and securities.

In 1979, Lucille suffered a stroke that paralyzed a good portion of her left side. When Henry brought her home from the hospital, he arranged for her to have 24-hour nursing care. From this time to the time of her death, Lucille was a semi-invalid and continued to have 24-hour nursing care. Despite her physical problems, Lucille appears to have maintained her mental faculties. Although the evidence on the issue is sharply conflicting, the trial court found that she suffered from no memory loss, disorientation, or dementia as a result of her stroke.

Shortly before he died, Henry told Lucille that he had suffered some business losses and that he feared that he might not be able to afford to continue her 24-hour nursing care. Lucille greatly feared being sent to a care home and did not want to be alone. To the end of her life, she feared losing her 24-hour nursing staff and being sent to a care home.

In December 1982, Henry was about to leave for work when he fell down the basement stairway at his home. As a result of his injuries, Henry died at the hospital later that day at the age of 89.

At the time of Henry's death, neither Henry nor Lucille had any living siblings. Their only heirs were various nieces and nephews on both sides of the family. Henry did not leave a will, and his entire estate passed to Lucille under the laws of intestate succession.

Lucille had executed a will in 1976. The appellants, whom we shall collectively refer to as the contestants, are from Lucille's side of the family and would have shared in her 1976 will. They are: Leonard Lebow, her great nephew; Wendy Lebow and

Heather Lebow, her great nieces; and Shirley Hellman, the widow of her nephew Bert Lebow.

The proponents of the will are the appellees, and we shall collectively refer to them as proponents. They are all the devisees and legatees under Lucille's 1982 will. It is this will which is being attacked by the contestants and which was admitted to probate. The proponents are all from Henry's side of the family. They are: Sonya Ropfogel, Henry's niece; Leonard Ropfogel, the husband of Sonya and the named executor in the 1982 will; the three children of Sonya and Leonard, Susan Ropfogel Poppelwell, Terry Ropfogel Mueller, and Linda Ropfogel; Joyce Weingarden, the daughter of Henry's brother Abner; and Paul Weingarden, Robert Weingarden, and Phillip Weingarden, the surviving children of Henry's sister, Gertrude Weingarden.

Thus, the battle was joined. The proponents sought to admit the 1982 will of Lucille to probate. The contestants sought to deny probate of that will on the grounds that it was a product of undue influence, that Lucille lacked testamentary capacity, and that the will should be denied probate under K.S.A. 59-605.

The principal actors in the combat taking place are Leonard and Sonya. It is they whom the contestants brand as villains. It is Sonya and Leonard who are accused of exerting undue influence, and it is Sonya whom the contestants assert actually prepared Lucille's 1982 will. Leonard and Sonya, on the other hand, argue that they only sought to aid, assist, and comfort an aging, sick, and lonesome Lucille. They came to her aid on the day of Henry's death, and they continued to provide her with aid, comfort, and assistance to her dying day.

The evidence in this case is, at times, sharply conflicting. In the final analysis, the trial court chose to believe the evidence submitted by the proponents of the will and chose to disbelieve the evidence of the contestants. Our task is to determine whether the trial court erred in choosing this course of action.

A complete recital of the facts would greatly extend this opinion. We shall attempt to sketch those facts as they apply to the issues raised. We note that the essential issue on appeal is the validity of Lucille's 1982 will, and we concentrate on the facts which relate to that question.

After Henry's death, various individuals came to the aid and assistance of Lucille. Among those responding were Leonard and Sonya. Among the issues discussed was whether Henry had left a will.

Apparently, Henry and Lucille had done a good deal of their past legal work with Arthur Skaer, of Wichita, who had written Lucille's 1976 will. However, Leonard's attorney was Tom Triplett, also of Wichita. On the day of Henry's death, Leonard called Triplett and asked him about the effect of Henry's apparent intestacy. Triplett advised Leonard of the law, and the parties discussed the need to administer Henry's estate. Later that same day, Leonard called Triplett and told him that Lucille wanted Leonard to serve as administrator of Henry's estate and instructed Triplett to draw up the necessary pleadings to get this accomplished.

Pursuant to instructions from Leonard, Triplett drew the necessary documents and took them to Lucille's home that evening on his way home from work. Triplett testified that Lucille seemed alert and told him she had great confidence in Leonard and wanted him to serve as administrator of Henry's estate. While at Lucille's home, Triplett was advised by an accountant for Henry that Henry's estate would be valued at somewhere between $40 million and $50 million.

Upon learning of the value of Henry's estate, Triplett advised Lucille, who was very surprised but relieved that she could apparently afford to keep her 24-hour nursing staff. It is to be noted that Lucille, at times, expressed some dissatisfaction with the fact that Henry had hidden their wealth from her all of the years of their marriage. She indicated some resentment over the manner in which they had lived while she labored under the belief they were nearly penniless.

Ultimately, Leonard was appointed administrator of Henry's estate. The problem of posting a very large and costly bond was solved by having Lucille sign the surety bond for Leonard.

We note at this point that Henry died on December 1, 1982. The will in question was executed on December 21, 1982. As a result, the events which we relate took place over a rather short time frame.

A few days after Henry's death, Leonard discovered that Henry had a lock box at a local bank. No key could be located, and Leonard made the necessary arrangements to have the box drilled. The box was opened in the presence of Leonard and Triplett. In looking through the box, the two discovered Lucille's 1976 will, along with certain other documents and a diamond ring. The box was then rekeyed in the names of Lucille and Leonard, and the 1976 will was placed back in the box. Triplett advised Leonard to tell Lucille they had found her will. Leonard did so advise Lucille and, a few days later, called Triplett and told him that Lucille wanted a copy of her will. Triplett and Leonard then removed the will from the lock box and made a copy for Lucille. The original will was placed in a safe at Triplett's law office.

In time, Triplett went to Lucille's house with the copy of her 1976 will. Lucille advised Triplett that, at the time she executed the 1976 will, she did not think that she had any money or property. She told Triplett that, since all of her newly acquired wealth came from Henry, she wanted to change her 1976 will to leave her entire estate to Henry's side of the family. Lucille advised Triplett that this is what she believed Henry would want her to do.

Several days later, Triplett got a telephone call from one of Lucille's nurses, telling him that Lucille was ready to change her will. Triplett went to Lucille's home and discussed with her the terms of her proposed will. The record indicates that the parties were alone in the room at the time the terms of Lucille's proposed will were discussed. Lucille instructed Triplett to draw a will, leaving the estate to persons on Henry's side of the family.

According to Triplett, during the meeting to discuss the details of her will, Lucille was clear and direct. He thought she might have had a piece of paper in her hand while she was telling him what she wanted in her will. However, Triplett could not remember whether Lucille looked at or referred to this piece of paper in giving him instructions.

In any event, Triplett drew the will as directed by Lucille and returned to her home the next day. He brought with him two individuals from his law office to serve as witnesses. Triplett began to read the will to Lucille, and, at one point, she stopped his

recitation, telling him that she wanted to leave her engagement ring to Sonya. Triplett made this change on the will, and Lucille executed the will. As indicated above, this will was executed on December 21, 1982.

According to Triplett, after the 1982 will was executed, he thought that he had torn up her 1976 will and tossed it in the trash can. Triplett took the new will and placed it in the safety deposit box, which was in the name of Leonard and Lucille. Lucille died on October 23, 1989, and her 1982 will remained in full force and effect from the date of its execution to the date of her death.

The 1982 will, which was admitted to probate, distributes Lucille's estate as follows:

(a) Lucille's engagement ring and residence to Sonya.

(b) The sum of $1,000 to Susan Ropfogel.

(c) The sum of $1,000 to Terry Mueller.

(d) The sum of $1,000 to Linda Ropfogel.

(e) The sum of $5,000 to the Hebrew Congregation Synagogue of Wichita.

(f) The rest and residue of Lucille's estate was devised and bequeathed as follows:

(1) An undivided one-third of the rest and residue to her brother-in-law, Abner Weingarden, and if he did not survive her, his share was to be paid to his daughter, if she was living at the time of Lucille's death.

(2) An undivided one-third interest of the rest and residue to her sister-in-law, Gertrude Weingarden, or in the event Gertrude Weingarden was not living at the time of her death, then to the children of Gertrude Weingarden living at the time of Lucille's death.

(3) An undivided one-third interest in the rest and residue to her niece, Sonya, or to the children of Sonya if Sonya was not living at the time of Lucille's death.

Additional facts will be discussed when necessary to deal with the issues.

## PROOF REQUIRED TO PROVE UNDUE INFLUENCE

The trial court, in conclusion of law No. 2, ruled:

"Where proponents of a will establish a prima facie case of due execution and capacity, the burden shifts to those contesting such will to prove their defenses of undue influence and lack of testamentary capacity by *clear and convincing evidence.*" (Emphasis added.)

The contestants argue ·that this conclusion of law is erroneous. They do not dispute that they have the burden of proving undue influence but argue that their burden is to prove it only by a preponderance of the evidence. It is the contention of the contestants that the trial court committed reversible error in requiring their proof to reach a clear and convincing standard.

The question is not as easily resolved as might be imagined. We recognize the theoretical seriousness of the contestants' argument. As a practical matter, when trial is to the court, the weighing of evidence is largely a matter left to the "eye of the beholder." We doubt very much that an experienced trial judge is much bothered by euphemisms such as clear and convincing · or preponderance of the evidence. The process of fact finding is entirely subjective, and it is highly unlikely that the decision in this case would have been any different if the evidence had been weighed by a higher standard. Still, .we agree that, if the trial court erred in its conclusion as to the required standard of proof, such error would be reversible error.

This court held in the recent decision of *In re Estate of Koch*, 18 Kan. App. 2d 188, Syl. ¶ 16, 849 P.2d 977 (1993):

"When a will is offered for probate, the proponent has the burden of proof in the first instance to present a prima facie case showing due execution of the will. Once this prima facie showing has been made, the burden of proof shifts to the contestant to overcome that showing by clear, satisfactory, and convincing evidence."

We made this statement in the context of placing the burden of proof on an issue of undue influence. We believe that to be the correct standard of proof in such cases. We conclude, however, that we cannot simply rest our decision on *Koch* without further comment.

The contestants base their argument in this appeal on two Supreme Court cases which clearly support that argument. In *Colvin v. Colvin*, 128 Kan. 691, 280 Pac. 763 (1929), the Supreme Court was dealing with a claim that a will was the result of undue

influence. In explaining the burden of proof, the Supreme Court said:

"The first assignment of error is in overruling the demurrer to plaintiff's evidence. It is correctly argued by the appellant that there is no presumption of the exercise of undue influence even when a fiduciary relationship exists as in this case, when the evidence affirmatively shows that [the testatrix] had independent counsel to advise her. On the other hand, the presumption is in favor of the validity of the will when it has been regularly admitted to probate in the proper court, as this will was admitted. So there is no question in this case as to any presumptions being in favor of the plaintiffs, but in fact the presumption is against them and *the burden of proof is upon them to establish by a preponderance of the evidence that there was in fact undue influence exercised over the mother by the son in the execution of the will.*" (Emphasis added.) 128 Kan. at 696.

The *Colvin* case says that, while there is a presumption in favor of the proponents when the will has been admitted to probate, the contestants can overcome that presumption by a preponderance of the evidence. We note that the decision cites no previous cases in support of the statement made.

In *In re Estate of Eyman*, 181 Kan. 90, 309 P.2d 664 (1957), the Supreme Court again dealt with the issue of undue influence in a will contest. In that case, the court said:

"The burden of proof is upon the parties attacking the will of a person of sound mind on the ground of undue influence. *All that is necessary is that the evidence produced shall preponderate over the evidence adduced and the presumptions prevailing on behalf of the proponent of the will.* In making proof the parties attacking the will are not limited to the bare facts which they may be able to adduce, but they are entitled to the benefit of all inferences which may be legitimately derived from the established facts. (*Ginter v. Ginter*, [79 Kan. 721, 101 Pac. 634 (1909)]; *Colvin v. Colvin*, 128 Kan. 691, 280 Pac. 763; and *In re Estate of Harris*, 166 Kan. 368, 374, 201 P.2d 1062.)" (Emphasis added.) 181 Kan. at 98-99.

The last authority cited by the contestants to support their position is taken from 3 Bartlett, Kansas Probate Law and Practice § 1247, p. 117 (rev. ed. 1953), where the author stated:

"The usual rules as to the weight and sufficiency of the evidence prevail in proceedings to contest or establish wills. What constitutes testamentary incapacity or undue influence invalidating a will is a question of law. But whether a testator had mental capacity to make a will or made a will under undue influence is a question of fact to be determined by the trial court from the evidence. *The triers of the facts are to determine the questions in issues by a preponderance of the evidence.*" (Emphasis added.)

There is clear authority cited by the contestants to this court to support their position. The question we must decide is whether the authorities cited by the contestants are still controlling.

We conclude that the authorities cited by the contestants are either no longer controlling or were simply misstatements of the applicable standard of proof required.

In decisions dating as far back as 1909, it has been recognized that, to overcome a prima facie case of a will's validity, the proof must be something more than a mere preponderance. In *Ginter v. Ginter*, 79 Kan. 721, 738, 101 Pac. 634 (1909), the rule is stated as follows:

"When an instrument is presented in the form of a will which has been duly executed and attested according to the statute of wills the law presumes it to be valid. This presumption must be overcome by proof, and the burden of proof rests upon whoever alleges it to be the product of undue influence or fraud. *In all cases this proof must be substantial.*" (Emphasis added.)

In *Brennan v. Dennis*, 143 Kan. 919, 954, 57 P.2d 431 (1936), the court said: "He who alleges such undue influence and fraud has the burden of proof. *The proof must be substantial,* so that judges of the facts, who know what undue influence is, may see by whom and in what manner it has been exercised." (Emphasis added.)

Undue influence, in order to vitiate the will of a decedent, must directly affect the testamentary act itself. It must be so powerful and overwhelming that it obliges the testator to adopt the will of another. *In re Estate of Ziegelmeier*, 224 Kan. 617, 622, 585 P.2d 974 (1978). Consequently, undue influence is a defense to a prima facie case that the will was properly executed. In fact, in the instant matter, the written defenses filed by the contestants to the petition for probate allege undue influence as a written defense to that petition.

When viewed from this particular perspective, it is apparent that those who seek to deny the probate of a will on the grounds of undue influence must rebut the presumption of validity which arises from the proof of a prima facie case.

The trial court found that a prima facie case of due execution and capacity had been shown by the proponents. The decisions

in this state are numerous as to the standard of proof required to rebut a prima facie showing of due execution:

"The general rule is that where a will is offered for probate, the burden of proof in the first instance is upon the proponent to make a prima facie case showing due execution of the will and *when such a prima facie showing has been made, the burden shifts to the contestant to overcome that showing by clear, satisfactory and convincing evidence.*" *In re Estate of Wallace,* 158 Kan. 633, 637, 149 P.2d 595 (1944).

Other Kansas cases to the same effect include: *In re Estate of Suesz,* 228 Kan. 275, 277, 613 P.2d 947 (1980); *In re Estate of Perkins,* 210 Kan. 619, 624, 504 P.2d 564 (1972); *In re Estate of Wittman,* 161 Kan. 398, 401-02, 168 P.2d 541 (1946).

There is another reason for the clear and convincing standard of proof. Undue influence is a species of fraud, and the terms in our decisions are used almost interchangeably. *In re Estate of Ziegelmeier,* 224 Kan. at 622; *In re Estate of Carothers,* 220 Kan. 437, 443, 552 P.2d 1354 (1976); *Hopper v. Sellers,* 91 Kan. 876, 884, 139 Pac. 365 (1914); *Ginter v. Ginter,* 79 Kan. 721, Syl. ¶ 2.

In this state, the burden of proving fraud has almost always been higher than a mere preponderance of the evidence:

"Defendant next contends the agreement was induced by fraud, coercion and undue influence. It is hardly necessary to list the citations of authority on the long-standing rule in this state that one who asserts fraud must prove it by a preponderance of the evidence; that such evidence should be clear, convincing and satisfactory, and that it does not devolve upon the party charged with committing the fraud to prove the transaction was honest and bona fide. Fraud is never presumed; it must be proved. Mere suspicion is not sufficient. [Citation omitted.]" *Hoch v. Hoch,* 187 Kan. 730, 732, 359 P.2d 839 (1961).

We note that the Supreme Court in *Hoch* talks about the burden being not only by a preponderance of the evidence but by a preponderance of clear, convincing, and satisfactory evidence. We suspect that somewhere along the line the use of the words "preponderance of the evidence" has been dropped from the standard of proof required in showing fraud and undue influence while the language of clear, convincing, and satisfactory evidence has been retained. That would explain, to some extent, the apparent inconsistency between the cases cited by the contestants and other decisions on the issue. Whatever the expla-

nation, there is no question but that, in this state, fraud is never presumed and must be shown by clear and convincing evidence. *Waxse v. Reserve Life Ins. Co.*, 248 Kan. 582, Syl. ¶ 3, 809 P.2d 533 (1991); *Stauth v. Brown*, 241 Kan. 1, Syl. ¶ 4, 734 P.2d 1063 (1987).

In order for us to hold in favor of the standard sought by the contestants, we would be required to disregard most of the recent Kansas decisions on the subject. The recent decisions are consistent that, once a prima facie case of due execution is shown, the burden to overcome it is on the contestant to do so by clear, convincing, and satisfactory evidence. In this case, the prima facie case of due execution has been shown; the defense to that prima facie case is undue influence, and we conclude that the burden required to prove undue influence is by clear, convincing, and satisfactory evidence. We believe that the authorities cited by the contestants are either misspoken statements of the rule or decisions whose binding precedence has disappeared. In any event, we decline to follow those authorities and affirm the decision of the trial court as to the standard of proof required.

## UNDUE INFLUENCE

The contestants next cite error in the court's rulings on the issue of undue influence. They complain that the trial court erred in failing to find that Sonya stood in a confidential and fiduciary relationship with Lucille. They also assert that the trial court failed to find that "suspicious circumstances" existed surrounding the execution of the will by Lucille.

This is a complex issue involving two principal questions of fact. The first question is whether Sonya stood in a confidential and fiduciary relationship with Lucille.

In order to prove undue influence, it must be shown that Sonya was in a confidential and fiduciary relationship with Lucille. The trial court found that Sonya's husband, Leonard, did occupy a confidential or fiduciary relationship with Lucille. This is a finding of fact to which no one objects. There is little question but that Leonard was in a confidential and fiduciary relationship with Lucille. However, Leonard was not a beneficiary of the last will and testament of Lucille, and his confidential and fiduciary re-

lationship with Lucille does not invalidate her will on the grounds of undue influence.

The contestants attack as erroneous, as a matter of law, the following finding of the trial court:

"49. The relationship of [Sonya] to [Lucille] at this time was no more than that of providing for the daily care of an aged and disabled relative, as she performed the functions stated in [finding number] 38. This was not a confidential or fiduciary relationship."

As with virtually every issue presented to this court, the evidence of Sonya's relationship with Lucille was sharply conflicting. There is evidence in the record on which the trial court could have found that a fiduciary and confidential relationship existed between Sonya and Lucille. However, the trial court chose to believe the evidence to the contrary offered by the proponents. This presents a very difficult hurdle for the contestants to overcome.

To begin with, the trial court's finding is a negative finding. The effect of a negative finding has been stated on many occasions by the appellate courts of this state:

"The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed." *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, Syl. ¶ 5, 548 P.2d 719 (1976).

See *Mohr v. State Bank of Stanley,* 244 Kan. 555, 567-68, 770 P.2d 466 (1989); *Lostutter v. Estate of Larkin,* 235 Kan. 154, 162-63, 679 P.2d 181 (1984); *Jennings v. Speaker, Executrix,* 1 Kan. App. 2d 610, 619, 571 P.2d 358 (1977).

Under our decisions, the question of whether a fiduciary or confidential relationship exists is a question of fact:

" 'The existence or non-existence of a confidential or fiduciary relationship *is an evidentiary question or finding of fact which must be determined from the facts in each case; and, therefore, the scope of appellate review is to ascertain only whether there is substantial competent evidence to support the finding of the trial court.* [Citations omitted.]

"In passing on a trial court's determination of the existence or nonexistence of a fiduciary or confidential relationship, *an appellate court is required to*

consider the evidence in its most favorable aspect in relation to the party who prevailed in the court below. [Citations omitted.]" (Emphasis added.) *Olson v. Harshman*, 233 Kan. 1055, 1057, 668 P.2d 147 (1983).

In *Hotchkiss, Administrator v. Werth*, 207 Kan. 132, 140, 483 P.2d 1053 (1971), this type of case was designated as a "fact case":

"So that there will be no misunderstanding about the matter—in considering this case we are fully aware that *it is what frequently is referred to as a 'fact case'—that findings of the trial court, when supported by any substantial evidence, must stand and are not to be set aside on appeal even though there is evidence which would support a contrary finding, that we are not to weigh the evidence—and that the scope of appellate review is to determine whether findings are so supported.* Inherent in the rule also is the duty to determine whether the conclusions of law are supported by the findings of fact." (Emphasis added.)

As we have examined this record, we find no indication of bias, passion, or prejudice by the trial court. We also conclude that the finding in question is supported by substantial competent evidence.

From the evidence presented, the trial court had to determine whether Sonya was in a confidential or fiduciary relationship with Lucille. A confidential or fiduciary relationship has been defined on numerous occasions:

" ' "A fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." ' " *Olson v. Harshman*, 233 Kan. at 1058-59.

In *Brown v. Foulks*, 232 Kan. 424, 430-31, 657 P.2d 501 (1983), the court stated:

"It is difficult to define the term 'fiduciary relation.' It may be defined generally as a relation in which, if a wrong arises, the same remedy exists against the wrongdoer on behalf of the principal as would exist against a trustee on behalf of the cestui que trust. *The term 'fiduciary relation' has reference to any relationship of blood, business, friendship, or association in which one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over the first party.* In *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235 (1982), *it was held that whether or not a confidential or fiduciary relationship exists depends on the facts and circumstances of each individual case.* This court has refused, for that reason, to give an exact definition to fiduciary relations. It was stated that a fiduciary relationship does not exist upon some technical

relation created by, or defined in, law. It may exist under a variety of circumstances and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence. *Lindholm v. Nelson*, 125 Kan. 223, Syl. ¶ 3, 264 Pac. 50 (1928). In *Lindholm*, it was stated that courts have consistently refused to give an exact definition to, or to fix definite boundaries of, that class of human relations which, by principles of common honesty, require fair dealing between the parties, and which is commonly known as fiduciary relations."

In considering whether Sonya had a confidential or fiduciary relationship with Lucille, it is important to note the relevant time frame. Henry died on December 1, 1982, and Lucille executed the will in question on December 21, 1982. The time frame in terms of impact on the will of Lucille is relatively short. If it is to be of any consequence on the question of the validity of the will, the confidential or fiduciary relationship must have existed at or before the time Lucille executed her will. It is apparent that, as time went on and as Lucille's age increased and her physical health decreased, she depended more and more upon Sonya. However, at the time Lucille's will was executed, her husband had recently died, and she was surrounded by a 24-hour nursing staff who was at her beck and call in addition to Sonya. Her physical and mental condition was as good as it ever was from that time to the time of her death.

The trial court found that Leonard managed Lucille's financial and business affairs after Henry's death. As pointed out, Leonard was in a confidential and fiduciary relationship with Lucille. On the other hand, Sonya was found to be looking only after Lucille's personal care. She came to the house every other day, supervised the nursing care, and saw to the purchase of food and other household items. The trial court found this did not give rise to a confidential and fiduciary relationship.

As the Supreme Court pointed out in *Hotchkiss, Administrator v. Werth,* 207 Kan. 132, these are "fact" cases. We will affirm if the trial court's findings of fact are supported by substantial competent evidence, even though we may not have made the same factual findings had we been the finder of fact. In this case, we conclude there was evidence to support a finding that Sonya was in a confidential and fiduciary relationship with Lucille. However, there was also substantial competent evidence to support

the findings of the trial court. We do not weigh that evidence, nor do we judge the credibility of the witnesses. Our standard of review requires that we affirm the findings of the trial court that Sonya did not stand in a confidential and fiduciary relationship with Lucille.

The next issue concerning undue influence is that of suspicious circumstances. It is apparent that the contestants need to raise a presumption of undue influence. In order to do that, they must show more than the mere fact that Sonya was in a confidential and fiduciary relationship with Lucille:

" 'A confidential relation exists whenever trust and confidence is reposed by the testator in the integrity and fidelity of another, but *the existence of such relation between the testator and the favored beneficiary, standing alone, does not constitute undue influence.*' 94 C.J.S., Wills § 230, p. 1078. Finally, 'a presumption of undue influence is not raised and the burden of proof is not shifted by the mere fact that a beneficiary occupies, with respect to the testator, a confidential or fiduciary relation . . . .' Such a presumption is raised and the burden of proof shifted, however, '*when, in addition to the confidential relation, there exist suspicious circumstances* . . . .' 94 C.J.S. Wills § 239, pp. 1091-93." (Emphasis added.) *In re Estate of Brown,* 230 Kan. 726, 732, 640 P.2d 1250 (1982).

This rule is further discussed in the case of *In re Adoption of Irons,* 235 Kan. 540, Syl. ¶ 4, 684 P.2d 332 (1984), wherein the Supreme Court held:

"A presumption of undue influence is *not* raised and the burden of proof is *not* shifted by the mere fact that an individual occupies a confidential or fiduciary relation with another. Such a presumption is raised and the burden of proof shifted, however, when, in addition to the confidential relation, there exist suspicious circumstances. See *In re Estate of Brown,* 230 Kan. 726, 732, 640 P.2d 1250 (1982)." (Emphasis added.).

The court further defined the question to be answered in cases of this nature as follows:

"The question then is whether there was sufficient proof, not only of the existence of a confidential relationship but also whether there was sufficient proof of suspicious circumstances surrounding either Lori Klarfield's position as an attorney in this situation or Dr. Silvers' position as the appellant's doctor, to shift the burden of proof." *In re Adoption of Irons,* 235 Kan. at 547-48.

See *In re Estate of Kern,* 239 Kan. 8, 18, 716 P.2d 528 (1986).

The contestants argue that they proved a number of suspicious circumstances as a matter of law and that the trial court erred in not denoting those circumstances as suspicious. We disagree.

We have no Kansas decisions defining the term "suspicious circumstances." We think the absence of a specific definition of that term is wise and appropriate. What may appear as "suspicious" under one set of facts may be considered normal under another. For instance, ordinarily it would be considered suspicious for a testator or testatrix to disinherit his or her natural born children and leave the estate to others. Although this would be considered suspicious in most cases, there are certainly factual circumstances where such a disposition would be expected and not at all suspicious. It may ordinarily be "suspicious" to omit any provisions for family members and leave the estate to charity. However, there are factual circumstances in which this is not suspicious and may be normal and expected. Our Supreme Court has indicated in *Brown v. Foulks*, 232 Kan. 424, Syl. ¶ 2, that it would not state an exact definition of a confidential or fiduciary relationship. Its reasoning was that the existence of that relationship depends upon the facts and circumstances of each individual case. For the same reason, we decline to state a definition of the term "suspicious circumstances." The question of whether suspicious circumstances exist must necessarily depend on the facts and circumstances of each individual case.

The question of whether suspicious circumstances exist is a question of fact to be determined on a case-by-case basis in the light of the factual background presented. To that question, we apply our well-known standard of review and affirm the trial court's decision if it is supported by substantial competent evidence.

"The presumptions which arise on the showing of a personal or confidential relation together with suspicious circumstances are *presumptions of fact which may be rebutted.* However, the effect of such rebutting testimony is not to make the presumption disappear, but to raise an issue for the jury." (Emphasis added.) 94 C.J.S., Wills § 239, pp. 1103-04.

The contestants presented the trial court with a series of alleged "suspicious circumstances." The trial court held that, under the totality of circumstances shown by the evidence, those instances

asserted by the contestants to be suspicious were, in fact, not suspicious. We conclude that the trial court's decision in this regard was supported by substantial competent evidence and should be affirmed.

The contestants argue that, as a matter of law, the circumstances shown were suspicious and ask that we so hold. As indicated, we believe this to be an issue which we must defer to the finder of fact. Among the circumstances alleged to exist are the following:

(1) **Lucille's condition:** The contestants argue that Lucille was old, sick, weak, and disoriented. They point out she had a stroke in 1979, which left her handicapped and bedridden. The contestants argue that Lucille's physical condition was a suspicious circumstance. The trial court found that Lucille did not suffer from any memory loss, disorientation, or dementia as a result of her stroke. The court found that she was depressed and fearful of going to a care home, but not incompetent. This finding of the trial court is supported by substantial competent evidence and negates the physical condition of Lucille as a suspicious circumstance.

(2) **Timing:** The contestants point out that the 1982 will was written only a few weeks after Henry's death. They suggest this was suspicious because Lucille was depressed, upset, and anxious, and they think it strange that she had started to worry about estate planning. The trial court found nothing suspicious about Lucille wanting to change her will shortly after Henry's death. The trial court pointed out that, up until the day of Henry's death, Lucille did not believe that she owned substantial property. The court's findings further pointed out that the primary beneficiary of her 1976 will was dead at that time, that two of the secondary beneficiaries were dead, and that the remaining secondary beneficiary was dying in Israel. The trial court found nothing suspicious about Lucille's desire to change her will within three weeks of Henry's death. This finding is supported by substantial competent evidence.

(3) **The 1976 Will vs. The 1982 Will:** The contestants point out that the 1976 will left everything to Lucille's blood relatives, whereas the 1982 will left the entire estate to Henry's blood relatives. The contestants describe the provisions of the 1982 will

as unnatural, strange, and suspicious. The trial court found that this situation would be suspicious if, indeed, the contestants were the natural objects of Lucille's bounty. However, it found that they were not. One of the four contestants is not related by blood, but is a niece-in-law of Lucille's, which is not a close relationship. The court pointed out that the remaining three contestants were blood relatives of Lucille, collaterally and two generations removed. The evidence strongly indicated that Lucille did not have a close relationship with any of the contestants. The blood relatives that she was close to were all deceased. At the time she wrote the will in question, the contestants could not be considered the natural objects of her bounty. They were all born and raised in other states and had little contact with Lucille. The court found that Leonard Lebow visited with Lucille in 1978 and then again in 1986 and had no contact in the interim. Heather Lebow did not know of Lucille's stroke in 1979 or of Henry's death in 1982 until 1986. Wendy Lebow saw Lucille in 1967 or 1968 and not again until 1986. She did not know of Lucille's stroke or of Henry's death until 1986. The trial court concluded that none of the contestants were natural objects of Lucille's bounty and that, in fact, it was not suspicious that they were not named as beneficiaries under the will. We agree with that finding; it is amply supported by the evidence shown in the record.

(4) **Beneficiaries of 1982 Will:** The contestants argue that the beneficiaries named in the will are, themselves, suspicious. The court found this was not a fact, holding that it was not suspicious that Sonya was a beneficiary under the will. The court rightly pointed out that Lucille relied on Sonya for her daily needs and that they were very close. The court found that it would have been suspicious had Sonya not been named a beneficiary under Lucille's will. The contestants argued that it was suspicious that only certain of Henry's relatives were named as beneficiaries, whereas others were excluded. They point out that those not named were not favored by Sonya. The court found that this was not suspicious and that it would not speculate why certain relatives were named and others were not.

(5) **"I thought you loved me.":** The contestants seize on a statement which Sonya was overheard making to Lucille. Nurse Andrews testified that she heard Sonya say to Lucille, "I thought

you loved me," as many as three times. The contestants argue this is suspicious because they believe it was said when Sonya was trying to convince Lucille to write a will in her favor. However, the evidence does not show why the statement was made nor the subject matter of the conversation during which it was made. The trial court concluded from the totality of the evidence that it would be pure speculation to connect "I thought you loved me" to the drafting of a new will. The evidence showed that many times when Lucille became difficult, Sonya was called to deal with her in an attempt to get her to cooperate. The court concluded that it was just as likely that the "I thought you loved me" statement was related to an effort to get Lucille to cooperate with her nurses rather than cooperate in the writing of a new will.

These are only a few of the suspicious circumstances presented by the contestants. Again, this is a *factual* issue. The findings of the trial court contrary to the contestants are supported by substantial competent evidence and are affirmed. There is evidence to support the argument of the contestants, but it is conflicting, and we are not the trier of fact.

The trial court, in resolving these issues, placed some emphasis on the actions of the contestants. The record shows that at least some of the contestants knew as early as 1986 that Lucille had made a new will, which included the Ropfogels and excluded the contestants. Rather than consulting Lucille directly or confronting Sonya with their concerns, they consulted attorneys in both Chicago and Wichita. They met with and considered hiring a private investigator. They considered filing a conservatorship action and seeking a psychiatric examination of Lucille. They apparently rejected all of those ideas in favor of waiting until Lucille's death to contest the validity of her will. The court found that it was significant that, although the contestants had theorized that Sonya and Leonard had accomplished the 1982 will by exercising undue influence upon Lucille, they never, in any fashion, made any inquiry to Lucille or initiated any discussion with Lucille to test the accuracy of their theories. In essence, the circumstantial nature of the evidence in this case is due, in large part, to the decision of the contestants not to raise the issue while Lucille was still alive.

We have carefully examined the voluminous record in this case, and we hold that the trial court's decision that no suspicious circumstances were shown is supported by substantial competent evidence.

Finally, the contestants urge us to adopt the approach reflected by the decision of the Supreme Court of Oregon in *In re Reddaway's Estate*, 214 Or. 410, 329 P.2d 886 (1958). In that decision, the Oregon Supreme Court judicially identified the following facts as being suspicious circumstances: (1) confidential relationships; (2) involvement in procurements; (3) lack of independent advice; (4) secrecy and haste upon making a will; (5) change in testator's attitude towards others; (6) change in testator's plan of disposing of his property; (7) unnatural or unjust gifts; and (8) testator's susceptibility to influence. 214 Or. at 421-26.

The contestants ask us to adopt this approach and to judicially declare a laundry list of factors which we consider to be suspicious as a matter of law. We decline to do so. As pointed out earlier, we believe this is a question that is best dealt with on a case-by-case basis. It can only be resolved from the totality of the facts shown. We agree that some of these circumstances listed will be important in every case of this nature, but they will not always be "suspicious" in every factual situation shown. We decline to state in advance what we consider to be a "suspicious circumstance." We think such an approach is neither wise nor warranted by previous Kansas decisions on the issue.

## K.S.A. 59-605

The contestants argue that the will should be denied probate under K.S.A. 59-605, which reads as follows:

"If it shall appear that any will was written or prepared by the *sole or principal beneficiary in such will*, who, at the time of writing or preparing the same, was the confidential agent or legal adviser of the testator, or who occupied at the time any other position of confidence or trust to such testator, such will shall not be held to be valid unless it shall affirmatively appear that the testator had read or knew the contents of such will, and had independent advice with reference thereto." (Emphasis added.)

The contestants suggest that Sonya and Leonard prepared Lucille's will and that the statute quoted above is applicable. We do not agree.

The evidence in the record indicates that Lucille read and understood the will before executing the same. Whether she had independent advice is a question not reached by the trial court and a question which we do not find necessary to reach on this appeal.

The trial court specifically found that the will was not prepared by Sonya or Leonard. There is substantial competent evidence in the record to support that finding. Furthermore, the finding is a negative finding, which we will not disturb absent some evidence of bias, passion, prejudice, or arbitrary disregard of undisputed evidence. *Mohr v. State Bank of Stanley*, 244 Kan. 555, 567-68, 770 P.2d 466 (1989). We see none of those factors disclosed by this record.

The contestants rely on the "green sheet of paper theory." Tom Triplett, who prepared the decedent's will, testified that Lucille "might" have been holding a green sheet of paper in her hands when she told him the terms of her will. However, he could not remember whether Lucille looked at or referred to this piece of paper in giving him her instructions. The contestants point out that Lucille, as a result of her stroke, could not write. They extrapolate that fact into the theory that the green sheet of paper must have been prepared by Sonya and Leonard and must have contained their instructions on how Lucille should prepare her will. Thus, the green sheet of paper theory postulates that Sonya and Leonard prepared Lucille's will. The trial court expressly rejected the green sheet of paper theory. We agree with the trial court's decision. This theory is based upon pure speculation and is not supported by any hard evidence disclosed by the record. We note that Triplett was not certain that Lucille had the paper in her hands or that she ever referred to it when giving him the details of how to prepare her will. The trial court's finding of fact against the contestants is amply supported by the record.

K.S.A. 59-605 only applies if the *principal beneficiary* prepared the will. Leonard was not a beneficiary of the will of Lucille. Sonya is a beneficiary, but she basically shares equally in the estate with the children of Abner Weingarden and Gertrude Weingarden. It is true that Sonya receives slightly more than those two additional beneficiaries. However, we do not consider

that the difference in the amount received by Sonya is sufficient to conclude that she was the principal beneficiary under the will.

We considered this issue very carefully in our decision in *In re Estate of Koch*, 18 Kan. App. 2d 188, 198-204, 849 P.2d 977 (1993). Under that decision and others cited in it, Sonya would not be considered a principal beneficiary within the meaning of the statute. Although the trial court did not utilize this theory, we believe it supports the ultimate decision.

We affirm the decision of the trial court that the will was not to be denied probate under K.S.A. 59-605.

## TESTAMENTARY CAPACITY

The contestants argue that, as a matter of law, the trial court erred in its definition of testamentary capacity. They submit that Lucille did not fully understand the purchasing power of her estate and that, as a result, she lacked testamentary capacity.

There is some evidence in the record that Lucille failed to appreciate the full purchasing power of $40 million to $50 million. The record clearly indicates that she was aware that Henry, upon his death, had left her an estate in that amount. The question presented for our determination is whether an individual possesses testamentary capacity even though that individual may not fully understand the total purchasing power and value of his or her estate.

The law defining "testamentary capacity" in this state is clear:

"It is the established rule in Kansas, the deceased possesses testamentary capacity if, on the date he executes the instrument which determines the manner in which the property will be disposed after death, he knows and understands the nature and extent of that property, has an intelligent understanding concerning the disposition he desires to make of it, realizes who his relatives are and the natural objects of his bounty, and comprehends the nature of the claims of those whom he desires to include and exclude in and from participation in his worldly effects after he has no further need for them. [Citations omitted.]" *In re Estate of Ziegelmeier*, 224 Kan. 617, 621, 585 P.2d 974 (1978).

See *In re Estate of Raney*, 247 Kan. 359, 367, 799 P.2d 986 (1990).

Tested by the accepted definition of the term, Lucille did possess testamentary capacity. There is substantial competent ev-

idence in the record to support the trial court's decision in this regard.

The contestants argue that their theory is supported by *Holmes v. Campbell College*, 87 Kan. 597, Syl. ¶ 2, 125 Pac. 25 (1912). There is language in *Holmes* which indicates that the true test of whether the testator knows the nature and extent of his property is whether the testator can comprehend the quantity of the property and its value. However, *Holmes* dealt with a testator who did not know the full extent of his property and who lacked testamentary capacity based on the traditional definition of that term. In addition, *Holmes* was decided in 1912, and the Supreme Court has not seen fit to expand on that doctrine nor to repeat it since that time. We do not consider *Holmes* to be binding authority for the proposition asserted by the contestants.

The standard for testamentary capacity which the contestants would have us impose is not employed under current Kansas law. The contestants seek to quantify the traditional standard by requiring that inquiry must be made into whether the testator or testatrix appreciated the purchasing power of his or her estate. Such a standard would create chaos and confusion in determining testamentary capacity. We have all known individuals who we believe fail to fully appreciate how rich they were or at least fail to live as well as we believe they could or should. Under the standard proposed, doubt would be cast on the testamentary capacity of an individual who has a substantial estate but lives frugally and is concerned about the future. We would have to determine whether that person really understood how rich he or she was and how well he or she could have lived. Many individuals may not believe they will ever have enough to sustain them throughout old age and sickness. We would be required to determine whether these persons truly understood how foolish their fears were in view of the size of their estate. The standard sought by the contestants would require the courts to consider the frugality of a decedent to determine whether the decedent appreciated the purchasing power of his or her estate to determine testamentary capacity. We decline to adopt such a standard.

Lucille understood that she had an estate in excess of $40 million. Despite the huge size of her estate, she, at times, expressed fears of whether she could afford to keep her nursing

staff. This is not unusual for an individual who believed she had very limited assets most of her life and who was told by her husband that there might not be enough to keep that nursing staff intact. The fact that Lucille did not have the same faith in the purchasing power of $40 million as do these contestants does not mean that she lacked testamentary capacity.

Tested by the standard quoted in this opinion, the trial court did not err in concluding that Lucille had testamentary capacity when she executed her last will and testament.

## EVIDENTIARY MATTERS

The facts show that, in addition to the execution of her will, Lucille also executed trusts in 1983 and 1986. The contestants sought to admit evidence concerning the execution of these trusts on the issues of undue influence and testamentary capacity. The trial court refused to admit this evidence as well as other post-execution evidence.

The relevancy of testimony rests in the sound discretion of the trial court. *Herbstreith v. de Bakker*, 249 Kan. 67, 85, 815 P.2d 102 (1991). An abuse of discretion occurs when no reasonable person would take the view of the trial court. *Wahwasuck v. Kansas Power & Light Co.*, 250 Kan. 606, 609, 828 P.2d 923 (1992).

The contestants argue that evidence pertaining to the execution of the 1983 and 1986 trusts is relevant to establish undue influence. They suggest that this evidence is relevant to show the continuing influence that Leonard exercised over Lucille.

In general, the time when a will is made is the time of primary importance to be considered in a question of undue influence. However, capacity, conditions, and circumstances existing after that time may occasionally be considered as an aid in determining the primary question. *In re Estate of Millar*, 167 Kan. 455, 466, 207 P.2d 483 (1949).

The trusts in this case were executed one and four years after the execution of the will. We believe that such evidence has little relevance in determining whether undue influence occurred in the execution of the will. We do not find that the trial court abused its discretion in refusing to admit and consider evidence relating to the execution of the trusts.

There is evidence to indicate that, in 1989, Lucille was thinking about changing her will. Soon thereafter, Leonard and Sonya changed her life support instructions to "no code blue," meaning that no extraordinary measures should be used to save her life. The contestants argue that this evidence should have been admitted to show a course of conduct by Leonard and Sonya to safeguard Sonya's inheritance. We conclude that the trial court did not err in excluding this evidence. Whether the "no code blue" instructions were given for the reasons suggested by the contestants is a matter of speculation. In addition, the evidence appears to have little or no relevance on the issue of undue influence which, if it took place, took place seven years previously.

The contestants argue that the trial court erred in excluding as hearsay a statement made by a business associate of Henry to the effect that Henry told him not to trust Leonard. On appeal, the contestants argue that the testimony was not offered to prove the truth of the matter asserted, but to show that Henry made the statement and to indicate his state of mind.

We have examined the record, and the record indicates that the contestants conceded the statement was hearsay and admissible only if the trial court found Henry's state of mind to be relevant. There was no argument to the trial court that the statement was not offered to prove the truth of the matter asserted. Issues not presented to the trial court cannot be presented for the first time on appeal. *Diversified Financial Planners, Inc. v. Maderak*, 248 Kan. 946, 948, 811 P.2d 1237 (1991).

In the final analysis, what Henry may have thought about Leonard is irrelevant to the issues presented. It is Lucille's state of mind, not Henry's, that is at issue. Lucille left no property to Leonard, and there is no evidence that Henry communicated his dislike of Leonard to Lucille. Accordingly, we conclude that the evidence was not relevant, and the trial court did not err in excluding it.

Affirmed.